# In re Eastview at Middlebury, Inc.
## (Miriam Roemischer, Appellant)

[992 A.2d 1014]

No. 08-166

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed October 1, 2009

Motion to Amend Granted January 15, 2010

*Stephanie J. Kaplan*, East Calais, for Appellant.

*Mark G. Hall* and *David M. Pocius* of *Paul Frank + Collins P.C.*, Burlington, for Appellee.

¶ 1. **Johnson, J.** Dr. Miriam Roemischer appeals the Environmental Court's decision granting Eastview at Middlebury, Inc. a permit to construct a residential retirement community (the Project) in Middlebury, Vermont. We affirm.

¶ 2. Eastview plans to build a residential retirement community on a forty-acre portion of land in Middlebury. The land is part of a larger 384-acre tract owned by Middlebury College. The Project, as proposed, would be sited adjacent to the Porter Hospital and the Porter Nursing Home and near Dr. Roemischer's residence. The hospital and nursing home are located on land leased on a long-term basis from the college. Middlebury College and Porter Medical Center, Inc., the owner and operator of the hospital and the nursing home, purport to have agreed on a similar arrangement for the Project whereby the college would lease the forty acres to Porter Medical Center, which would in turn sublease the land to Eastview. These arrangements, however, have not yet been finalized.

¶ 3. In November 2005, Eastview filed its Act 250 application with the District 9 Environmental Commission. While Eastview's permit was before the Commission, Dr. Roemischer, who lives across the street from the proposed site, was granted party status to lodge her objections to the development. Notwithstanding her objections, on October 6, 2006, the Commission issued Land Use Permit #9A0314, having found that the Project complied with all applicable Act 250 criteria. See 10 V.S.A. § 6086(a)(1)-(10) (setting forth criteria and noting that compliance with same a prerequisite to a district commission's grant of a permit).[1] The Commission's order also concluded that, in addition to the forty acres proposed to be leased to Eastview for the Project, a further 207 acres of the original 384-acre tract owned by the college would be subject to Act 250 jurisdiction. These 207 acres would not, however, be subject to any of the specific permit conditions imposed on the Project.[2] The permit's preamble, however, states that it "applies to the land identified in the land records of Middlebury, Vermont, as the subject of a deed to a 384.7 acre tract or tracts of land," and condition 3 of the permit likewise declared that "[n]o material or substantial changes shall be made to the 384.7 acre tract or tracts

---

[1] For reasons discussed below, all references to this statutory provision are to the 2005 version.

[2] The Commission declared:

> these [207±] acres are subject to Commission jurisdiction and will require an amendment if there are any material changes to [them] that "[have] a significant impact on any finding, conclusion, term or condition of the [P]roject's permit and which may result in an impact with respect to any of the [Act 250] criteria."

of land without the written approval of the District Environmental Commission."

¶ 4. Neither Dr. Roemischer nor Eastview were satisfied with the Commission's decision. Dr. Roemischer timely appealed the grant of the permit to the Environmental Court, arguing that the Project did not meet several Act 250 criteria. Eastview, joined by Middlebury College and Porter Medical Center, filed a cross-appeal, arguing, in the words of the Environmental Court, that the Commission "[erred] in its determination concerning the amount of land to be covered by its [p]ermit." Eastview also contested Dr. Roemischer's standing to challenge the Commission's determination on Criterion 9(B), 10 V.S.A. § 6086(a)(9)(B), and the Commission's findings on this criterion in light of its conclusions regarding the scope of its jurisdiction and reach of the permit's conditions.

¶ 5. The Environmental Court found that Dr. Roemischer had preserved five issues for appeal, each regarding a specific Act 250 criterion, and that Eastview had preserved the claims set forth above for appeal. More specifically, the court concluded that Dr. Roemischer preserved challenges to the Commission's determinations regarding: Act 250 "Criterion 5, concerning the proposed Project's impact on traffic; Criterion 8, concerning the proposed Project's impact on aesthetics, scenic or natural beauty of the area; Criterion 9(A), concerning the Project's impact upon area growth; Criterion 9(B), concerning the Project's impact upon primary agricultural soils; and Criterion 10, concerning the Project's conformance with [Middlebury's] Town Plan."

¶ 6. The Environmental Court's decision was decidedly favorable to Eastview. Although it rejected Eastview's argument that Dr. Roemischer lacked party standing with respect to Criterion 9(B), it upheld the Commission's determinations on all five contested Act 250 criteria. The court further ruled that, contrary to the decision of the Commission, the "permit's encumbrance" is limited "to only the lands to be leased to Eastview for its project, since no other portion of the [c]ollege's lands will be included in the Eastview development." It then remanded the matter to the Commission to issue a permit allowing the Project to proceed.

¶ 7. Dissatisfied with this outcome, Dr. Roemischer filed a motion requesting that the Environmental Court alter its judgment. In support of her motion, she argued: (1) the court erroneously calculated the amount of primary agricultural soils

affected by the Project; (2) the court applied the wrong version of Criterion 9(B); and (3) it was improper for the court to rely on site observations without placing them on the record. According to Dr. Roemischer's motion, applying the correct version of Criterion 9(B) — the version in effect in 2005 when Eastview filed its application — is particularly important.[3] The 2005 version of Criterion 9(B), she contended, does not allow for offsite-mitigation agreements, such as the one entered into by Eastview, the Vermont Agency of Agriculture, Food and Markets, and the Vermont Housing and Conservation Board in connection with the Project, as a means of complying with subsection (i) of Criterion 9(B). Additionally, the 2005 version of Criterion 9(B) requires a showing not made by Eastview, that "the applicant can realize a reasonable rate of return on the fair market value of [its] land only by devoting the primary agricultural soils to uses which will significantly reduce their agricultural potential." 10 V.S.A. § 6086(a)(9)(B)(i).

¶ 8. The court disagreed with Dr. Roemischer's first and third contentions, as set forth above, but acknowledged that it had applied the wrong version of Criterion 9(B). It concluded that the correct version of Criterion 9(B), for purposes of evaluating Eastview's permit, was that in effect in 2005 when Eastview first submitted its permit application. Its earlier decision had applied the 2007 version of the criterion. Nevertheless, the court held that, under either version, Eastview was entitled to its permit.

¶ 9. Following the Environmental Court's ruling on her motion, Dr. Roemischer appealed to this Court. On appeal, she makes four principal arguments, which we set forth in detail below and address, in turn, after setting forth the applicable standard of review.

¶ 10. We review decisions of the Environmental Court deferentially. *In re Route 103 Quarry*, 2008 VT 88 ¶ 4, 184 Vt. 283, 958 A.2d 694. Because the Environmental Court "determines the credibility of witnesses and weighs the persuasive effect of evidence," we will not overturn its factual findings "unless, taking them in the light most favorable to the prevailing party, they are clearly erroneous." *Id.* (quotations omitted). This means that its factual findings "will not be disturbed merely because they are contradicted by substantial evidence." *In re Miller Subdivision*

---

[3] The statute was amended in 2006.

*Final Plan*, 2008 VT 74, ¶ 13, 184 Vt. 188, 955 A.2d 1200. Instead, we will overturn such findings only where the party contesting them demonstrates "that there is no credible evidence to support them." *Id.* Moreover, we will uphold the court's legal conclusions with respect to compliance with Act 250 criteria where such conclusions "are reasonably supported by the findings." *Id.*

## I.

¶ 11. On appeal, Dr. Roemischer first argues that the Environmental Court erred in overturning the Commission's determination that the scope of the permit embraced more than the forty-acre site on which the Project will be built. We disagree with Dr. Roemischer and affirm the result reached by the Environmental Court, but on a different rationale. See *Bloomer v. Gibson*, 2006 VT 104, ¶ 26 n.4, 180 Vt. 397, 912 A.2d 424 (noting "that this Court may affirm a trial court's decision if the correct result is reached" pursuant to a different rationale (citation omitted)).

¶ 12. Initially, we note that there is no dispute that the Project is a "development," as that term is defined by 10 V.S.A. § 6001(3)(A)(i) (" 'Development' means: The construction of improvements on a tract or tracts of land, owned or controlled by a person, involving more than 10 acres of land within a radius of five miles of any point on any involved land, for commercial or industrial purposes."). It is beyond peradventure that erecting a planned residential retirement community is "[t]he construction of improvements . . . for commercial . . . purposes," and the forty-acre Project exceeds the jurisdictional minimum acreage without even taking into consideration "involved land." 10 V.S.A. § 6001(3)(A); Envtl. Bd. R. 2(A)(F) (2004) (defining "involved land"). Thus, lacking an exemption, Eastview was required to apply for an Act 250 permit, 10 V.S.A. § 6081, and the District Environmental Commission had initial jurisdiction to review the Project's compliance with the ten Act 250 criteria. *Id.* § 6086(a). Indeed, that the Project triggered initial Act 250 jurisdiction is not in dispute.

¶ 13. The first issue is whether the Commission was entitled to assert jurisdiction over the entire 384 acres, even though the project is limited to forty acres. Dr. Roemischer asserts that the permit condition imposed by the Commission is supported by our decision in *In re Stokes Communications Corp.*, 164 Vt. 30, 664 A.2d 712 (1995). That decision neither controls nor is relevant here

because the concept of involved land in *Stokes* is addressed to whether Act 250 jurisdiction is triggered initially, not to the proper scope of a permit. In *Stokes*, we addressed a project situated on an acre of leased land that was part of a larger, over ninety-acre parcel that the developer did not own. We affirmed the Environmental Board's assertion of initial jurisdiction only after concluding that the entire ninety-acre parcel was "involved land." *Id.* at 36, 664 A.2d at 716. Were we to have held otherwise, we reasoned, "developers could circumvent the administrative process by simply leasing parcels which do not exceed the jurisdictional thresholds." *Id.* at 37, 664 A.2d at 717. Because *Stokes* relates to initial Act 250 jurisdiction, it has no bearing on the Commission's decision pertaining to the scope of the permitted project.

■ ¶ 14. Instead, our analysis of the propriety of the Environmental Court's conclusion on the scope of the permit is guided by our maxim that permit conditions and requirements must be reasonable, *In re Eustance Act 250 Jurisdictional Opinion*, 2009 VT 16, ¶ 19, 185 Vt. 447, 970 A.2d 1285, and by decisions of the former Environmental Board establishing the meaning of a "permitted project."

¶ 15. In *Stonybrook Condominium Owner's Ass'n*, the former Environmental Board faced a situation substantially analogous to the one faced here. Declaratory Ruling #385, Findings of Fact, Conclusions of Law, and Order at 9-21 (Vt. Envtl. Bd. May 18, 2001), at http://www.nrb.state.vt.us/lup/decisions/2001/dr385-fco.pdf. There, jurisdiction over the project in question had already been triggered, and the Board faced the question of "whether further activity on the tract — whether or not it has a nexus to the initial construction on the tract — requires a permit amendment." In *Stonybrook*, the Board ruled that answering the question of whether an amendment is required in those circumstances entails first determining the scope of the "permitted project," generally a simple matter involving the use of a bright line test: the "permitted project" is the "entire tract of land on which the construction occurs, even if construction only occurs on a portion of it." *Id.* at 14-17. The Board reasoned that this method "informs the world — the District Commission, the permittee, and all other interested persons — as to the lands that will be subject to scrutiny when further activities occur." *Id.* at 15. Eastview sought an answer on essentially the same issue in its cross-appeal at the Environmental

Court in light of the conditions attached to its permit and the Commission's order, as set forth in detail above. *Supra*, ¶ 3.

■ ¶ 16. Were there no exception to the bright-line rule, its application here would appear to support the Commission's ruling that the permit burdened the entire 384-acre tract of land owned by Middlebury, its permit condition prohibiting "material or substantial changes" on the tract "without the written approval of the District Environmental Commission." The Board further held in *Stonybrook*, however, that to mechanistically apply the "bright line" rule would be "neither wise nor fair." *Id.* at 17. To avoid "absurd results," the definition of a "permitted project" must "be tempered by reason and reality." *Id.* at 17-18. A "permitted project," therefore, may ultimately encompass "something less than the entire tract" where construction on a portion of the tract bears an insufficient relationship with, or nexus to, the rest of the tract. *Id.* at 18.

¶ 17. The Board elaborated on the requirement of a nexus between the permitted project and the remainder of the tract in *West River Acres, Inc.*, Findings of Fact, Conclusions of Law, and Order 8-10 (Vt. Envtl. Bd. July 16, 2004), at http://www. nrb.state.vt.us/lup/decisions/2004/2w1053-fco.pdf. There, the applicants owned several contiguous tracts of land and applied for a permit to develop a horse-showing and riding business on one 54.2-acre tract. The Commission found that all horse showing and almost all horse riding would occur on the 54.2-acre tract, although riders could ride on the other tracts, if they so chose. The Commission granted the permit but deemed all of the contiguous tracts within the scope of the "permitted project." The applicants appealed the permitted project ruling to the Board. The Board observed that the only environmental impact that the development would have on neighboring tracts would be occasional horse riding and observed that the West River Acres had no agreement allowing it to otherwise use the other tracts. It concluded, therefore, that there was not a sufficient nexus to satisfy *Stonybrook* and limited the scope of the "permitted project" to the 54.2-acre tract.

■ ¶ 18. In this case, we agree with the Environmental Court's conclusion that including the entire 384-acre tract of land as within the scope of the permitted project is unreasonable and would result in inequitable and absurd results. For example,

construed literally, Condition 3 of the permit could require Eastview to amend its permit by virtue of actions taken by third parties amounting to a material or substantial change elsewhere on the tract and completely unrelated to the Project. After conducting an extensive Act 250 review of the Project, the Environmental Court found that "no activity connected to the Eastview Project will occur on or impact upon the remaining [acreage]" of the 384-acre tract. It further found that Eastview will not "have authority to enter upon, develop or control any portion of [the tract] in any way." The impact here is even less than the minimal impact found in *West River Acres*, where the Board refused to define the scope of the permitted project as encompassing contiguous tracts. This situation reasonably supports the Environmental Court's conclusion that the scope of the permitted project here, and thus the permit itself, cannot extend to the entire 384-acre tract.[4]

## II.

¶ 19. Dr. Roemischer next argues that the Environmental Court erred in ruling that applicant was in compliance with Criterion 8. More specifically, she asserts that the court misapplied the applicable legal standard, improperly sustained an objection to a portion of the testimony of her expert witness on this criterion, and made a variety of other evidentiary determinations and factual findings that, taken together, require us to reverse the court's conclusion on this criterion. We find no merit in Dr. Roemischer's contentions.

---

[4] In her reply brief, Dr. Roemischer argues that the Environmental Board lacked the administrative authority to interpret "permitted project," as it did in *Stonybrook*, without formal rulemaking procedures. We need not consider this claim, as it was first raised in Dr. Roemischer's reply brief, and arguments first raised in reply briefs are not preserved. *Agency of Nat. Res. v. Glens Falls Ins. Co.*, 169 Vt. 426, 435, 736 A2d 768, 774 (1999). Dr. Roemischer's reply brief argues that Dr. Roemischer raised the issue in her brief by including a footnote directing us to a document that she had filed with the Environmental Court and also included in the printed case. Using a footnote to direct us to another document is not briefing an issue. *In re Cent. Vt. Pub. Serv. Corp.*, 2006 VT 70, ¶ 12, 180 Vt. 563, 905 A.2d 616 (mem.) (ruling that arguments made in footnotes of briefs are not raised as error on appeal); cf. *Graphic Controls Corp. v. Utah Med. Prods., Inc.*, 149 F.3d 1382, 1385 (Fed. Cir. 1998) (finding an argument waived when a party used a footnote to incorporate the argument by reference from the appendix, as such an argument did not comply with F.R.A.P. 28(a)(6) (1998), which uses the same language as current V.R.A.P. 28(a)(4)).

■ ¶ 20. Criterion 8 mandates that, before the court may sanction the grant of an Act 250 permit, it must conclude that the development "[w]ill not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas." 10 V.S.A. § 6086(a)(8). To guide its analysis, we observed in *In re Times & Seasons, LLC* that the court should "employ[] a two-pronged approach," the so-called "*Quechee* test," whereby it "determines if the proposed project will have an adverse aesthetic impact, and if so, it considers whether the adverse impact would be undue." 2008 VT 7, ¶ 8, 183 Vt. 336, 950 A.2d 1189; see also *In re Halnon*, 174 Vt. 514, 515, 811 A.2d 161, 163 (2002) (mem.) (same). We further noted that "[a]n adverse impact is considered undue" if the project (1) violates a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area, (2) offends the sensibilities of the average person, or (3) the applicant has failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings. *In re Times & Seasons, LLC*, 2008 VT 7, ¶ 8.

■ ¶ 21. In assessing the Project's compliance with Criterion 8, the Environmental Court correctly identified and applied the *Quechee* test as set forth above. The court began its analysis by assessing whether the Project would have an adverse aesthetic impact on the area to the north of the Project before addressing its aesthetic impact on the area south of the Project. With respect to the developed area north of the Project, the court concluded that it would be a "suitable addition" and would not have an adverse impact on the area's aesthetics. Regarding the undeveloped areas south of the Project, however, the court determined that the Project would "be a significant departure from the pre-existing natural beauty of the area" and ruled that it would adversely impact the area's aesthetic qualities. But the court concluded that the adverse impact would not be undue. In support of this conclusion, it first noted its finding that the Project, as proposed, complies with all applicable Middlebury zoning regulations. The court also noted that Middlebury's town plan contemplates the existence of the Project. Thus, the court did not have before it any evidence that the Project specifically violated a written community standard. Quite the opposite, the court had evidence that the Project was in accordance with Middlebury's

written standards, as reflected in its zoning ordinances and town plan. Additionally, the court found that the Project's adverse effects on the area's aesthetics would not offend the sensibilities of the average person in light of the Project's architecture, siting, and landscaping, which "incorporated . . . design characteristics from area homes" in a manner that provides a complement and not an "offense to the area" and preserved scenic views. Finally, the court noted the numerous steps Eastview took to mitigate the Project's impact on the area's aesthetic qualities. For example, it reduced the number of stand-alone cottages and further clustered the remaining cottages to obscure less of the scenic view. In sum, the Environmental Court's conclusion that the Project complied with Criterion 8 is amply supported by its findings, and we must, therefore, uphold it. *In re Miller*, 2008 VT 74, ¶ 13.

■ ■ ¶ 22. Dr. Roemischer's attempts to cast doubt on the court's factual findings, evidentiary rulings and, by extension, its ultimate legal conclusion regarding the Project's compliance with Criterion 8, are wholly unpersuasive. For example, she asserts that the Environmental Court improperly sustained Eastview's objection to the portion of the testimony of her expert witness, a landscape architect, wherein he conclusorily opined that Eastview had not taken generally available mitigating steps to minimize the Project's aesthetic impact on the surrounding area. The expert's testimony effectively stated a legal conclusion — the Project could not satisfy the *Quechee* test and, therefore, could not comply with Criterion 8. While Dr. Roemischer correctly observes that Vermont Rule of Evidence 704 generally allows an expert to offer testimony as to "an ultimate issue to be decided by the trier of fact," her argument fails to acknowledge important qualifiers to this general rule. The proffered testimony must be "otherwise admissible," V.R.E. 704, and "helpful." Reporter's Notes, V.R.E. 704. Here, the Environmental Court sustained Eastview's objection to Dr. Roemischer's expert's testimony because it "jumped to [a] legal conclusion." Such testimony is inadmissible. See *Riess v. A.O. Smith Corp.*, 150 Vt. 527, 532, 556 A.2d 68, 72 (1988) (holding that questions "ask[ing] for the ultimate conclusion at law" are inadmissible under V.R.E. 704). The court further noted that it did not "find [the expert's testimony] helpful because there is no substance there." We discern no error in the court's exercise of its discretion to sustain Eastview's objection. Even if the court had erred in its ruling, Dr. Roemischer fails to explain why — in light

of the fact that her expert's entire report on the aesthetic impact of the Project, including his conclusion that the Project "would have an undue adverse impact on [the area's] scenic qualities," was admitted into evidence — the failure to admit the expert's presumably cumulative testimony prejudiced her in this bench trial.[5] See *Griffis v. Cedar Hill Health Care Corp.*, 2008 VT 125, ¶ 18, 185 Vt. 74, 967 A.2d 1141 ("Rulings on the admission or exclusion of evidence are highly discretionary, and we will reverse only where discretion has been abused or withheld and prejudice has resulted.").

¶ 23. Dr. Roemischer also puts forth a veritable laundry list of the Environmental Court's findings that she contends are contradicted either by her testimony or that of Eastview's witnesses and require reversal of the court's ruling on Criterion 8. Dr. Roemischer misapprehends our standard of review on appeal. Our inquiry is limited to assessing whether there is *any* credible evidence supporting the court's findings, not whether they are contradicted by substantial evidence. *In re Miller*, 2008 VT 74, ¶ 13. Thus, even assuming that the record supports her assertion that these findings are contradicted, she does not contend that they lack support by credible evidence. Absent such a showing, we will not disturb the Environmental Court's findings. *Id.* Further, were we to construe her briefing on the matter to make this argument, she would still fail in persuading us to overturn the Environmental Court's legal conclusion regarding Criterion 8. She has made no attempt to explain why these purportedly unsupported findings are material to the court's analysis under the *Quechee* test.

¶ 24. She also contests the Environmental Court's ruling to admit one page of Eastview's multi-page exhibit 25, which featured a computer rendering of the Project. She claims that Eastview's witness was unable "to provide critical foundation information about [this] computer simulation." Dr. Roemischer does not elucidate how the court abused its discretion in admitting

---

[5] We further note with respect to prejudice that, notwithstanding the court's decision to sustain Eastview's objection, the court specifically prompted and then allowed Dr. Roemischer's attorney to ask the expert questions regarding examples of "mitigation steps that could have reasonably been taken in this project given the lay of the land and the structure of the site that would serve the lot and the neighborhood better."

this portion of the exhibit or how its admission prejudiced her. We thus see no basis for second-guessing the court's ruling with respect to this document. See *Griffis*, 2008 VT 125, ¶ 18; see also *Green Mountain Marble Co. v. State Highway Bd.*, 130 Vt. 455, 468, 296 A.2d 198, 206 (1972) ("It is a well established rule that the party who alleges error has the burden of showing that he has been prejudiced thereby. Otherwise it is presumed to be harmless, if it is error at all." (quotation omitted)).

■■ ■ ¶ 25. Finally, Dr. Roemischer makes a sweeping argument that the entire testimony of all of Eastview's experts on Criterion 8 was inadmissible under Rule 702 and "should be stricken or disregarded" because their testimony "was not based upon any demonstrated reliable principle or method." Her claim is fundamentally flawed. She has not demonstrated with specific references to the record that she preserved this argument for appeal. See V.R.A.P. 28(a) ("The brief of the appellant shall contain . . . (4) *[a]n argument*. . . . The argument shall contain the issues presented [and] how the issues were preserved . . . with citations to the . . . parts of the record relied on."); cf. *Quazzo v. Quazzo*, 136 Vt. 107, 111, 386 A.2d 638, 641 (1978) ("[W]e do not search the record for error not adequately . . . referenced."). In response to Eastview's assertion that she did not, in fact, preserve the issue, Dr. Roemischer, in her reply brief, directs us to her post-trial Proposed Findings of Fact, Conclusions of Law, and Order wherein she makes the same generalized argument that she does on appeal. This does not suffice. To preserve an objection to testimony for appellate review, a party must lodge a timely, substantive objection at trial. See V.R.E. 103(a)(1) ("Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record, stating the specific ground of objection"); *In re Estate of Peters*, 171 Vt. 381, 390, 765 A.2d 468, 475 (2000) ("In order to preserve a claim of error in the introduction of evidence, the party opposing the introduction must make a timely objection or motion to strike. This means that the objection must have been made at the time the evidence was offered or the question was asked." (citations omitted)). Neither Dr. Roemischer's brief nor her reply brief indicate where (or whether) she timely objected to these experts' testimony. We thus find her argument inadequately briefed and do not reach its merits. See *In re Boardman*, 2009 VT 42, ¶ 20, 186 Vt. 176, 979

A.2d 1010 (per curiam) (where claim inadequately briefed, it "need not be addressed on appeal").

## III.

¶ 26. Dr. Roemischer next argues that the Environmental Court erred in its determination that applicant was in compliance with Criterion 9(B).[6] Her argument has two main parts. First, she asserts that the trial court erred in finding compliance with three of Criterion 9(B)'s four subsections. Second, to the extent that the Environmental Court relied upon Eastview's mitigation agreement to demonstrate compliance with Criterion 9(B)(i), she claims that it erred in so doing because this subsection does not explicitly contemplate compliance by means of such agreements. Nor, Dr. Roemischer argues, could the Environmental Court rely upon decisions of the former Environmental Board concluding that such agreements could satisfy Criterion 9(B)(i)'s requirements because these decisions, made in the context of adjudicatory proceedings, were invalid; to make such a determination, Dr. Roemischer insists that the Board needed to have promulgated a rule according to the procedures specified in Vermont's Administrative Procedure Act.

¶ 27. The 2005 version of Criterion 9(B) reads as follows:

A permit will be granted for the development or subdivision of primary agricultural soils only when it is demonstrated by the applicant that, in addition to all other applicable criteria, either, the subdivision or development will not significantly reduce the agricultural potential of the primary agricultural soils; or,

(i) the applicant can realize a reasonable return on the fair market value of his land only by devoting the

---

[6] The parties dispute which version of Criterion 9(B) should apply as it was amended in 2006 — after Eastview filed its Act 250 permit application in November 2005. Dr. Roemischer insists that we apply the version of Criterion 9(B) in effect in 2005, whereas Eastview contends that we should look to the 2006 amended version. We agree with the Environmental Court that the only material difference between the two versions, for purposes of this case, is that subsection (i) of the 2005 version sets forth a requirement that the 2006 amended version does not — a view that neither party contests. Thus, for the sake of argument, we assume, without deciding, that the 2005 version of the statute applies and assess the Project's compliance with it.

primary agricultural soils to uses which will significantly reduce their agricultural potential; and

(ii) there are no nonagricultural or secondary agricultural soils owned or controlled by the applicant which are reasonably suited to the purpose; and

(iii) the subdivision or development has been planned to minimize the reduction of agricultural potential by providing for reasonable population densities, reasonable rates of growth, and the use of cluster planning and new community planning designed to economize on the cost of roads, utilities and land usage; and

(iv) the development or subdivision will not significantly interfere with or jeopardize the continuation of agriculture or forestry on adjoining lands or reduce their agricultural or forestry potential.

10 V.S.A. § 6086(a)(9)(B)(i)-(iv). A court assessing compliance with 9(B) employs a two-part analysis. *In re Spear St. Assocs.*, 145 Vt. 496, 500, 494 A.2d 138, 141 (1985). First, the court must evaluate "whether the development will significantly reduce the agricultural potential of the primary agricultural soils." *Id.* If there is no significant impact, the development satisfies the general criterion. *Id.* On the other hand, if agricultural soils are affected significantly, the four subcriteria must be satisfied to obtain a permit.

¶ 28. Here, the parties do not contest the Environmental Court's determination that the Project will significantly reduce the agricultural potential of the primary agricultural soils located on the land slated for its development but instead quarrel over whether the Environmental Court correctly concluded that the Project complies with certain of the subsections of the 2005 codification of Criterion 9(B). We address each contested subsection in turn.

¶ 29. The Environmental Court ruled in its decision on Dr. Roemischer's post-trial motion that the Project complied with Criterion 9(B)(i), reasoning that mitigation agreements are an accepted basis for conformance with this subsection. We affirm the Environmental Court's ruling on this subsection, though for a different reason. See *Bloomer*, 2006 VT 104, ¶ 26 n.4. In so concluding, we note also that we need not decide whether such agreements may offer a substitute means for complying with

Criterion 9(B)(i) because the record reveals that, even without such an agreement, Eastview has demonstrated compliance with this subsection. Nor need we address Dr. Roemischer's argument that the former Environmental Board exceeded its authority in concluding that an offsite mitigation agreement could provide an alternative means of complying with subsection (i).

¶ 30. As previously noted, Criterion 9(B)(i) requires Eastview to demonstrate that it "can realize a reasonable return on the fair market value of [its] land only by devoting the primary agricultural soils to uses which will significantly reduce their agricultural potential." 10 V.S.A. § 6086(a)(9)(B)(i). Based on the testimony of a representative of Middlebury College, the parcel's owner, the Environmental Court found in its original decision, and reiterated in its decision on Dr. Roemischer's post-trial motion to alter, that the land in question has been used only intermittently for agricultural purposes and attracts agricultural tenants only at below-market-rate rents. Thus we conclude that this finding was supported by credible evidence, and we have little difficulty in further holding that the below-market-rate rent generated by uses that do not reduce the agricultural potential of the soils does not provide a "reasonable return on the fair market value" of the parcel.

¶ 31. Further, our decision in *In re Times & Seasons* does not compel a contrary result, as Dr. Roemischer asserts. In that case, we concluded that we would not disturb the former Environmental Board's factual findings and ultimate conclusion that the applicant had not complied with Criterion 9(B)(i) where the applicant had "simply reiterate[d] the same conclusory arguments that it made before the Board." 2008 VT 7, ¶ 20. We expressed no opinion with respect to Dr. Roemischer's contention that a conclusion that a development complies with subsection (i) must always be preceded by an applicant affirmatively demonstrating (1) the fair market value of the tract proposed for development, (2) a reasonable rate of return, and (3) alternative projects that would have less of an impact on primary agricultural soils as its proposed project — the showings found lacking by the former Environmental Board in *In re Times & Seasons. Id.* ¶ 18. Put differently, the case cannot be read as setting forth a required list of findings sufficient for a court to conclude that a development has complied with Criterion 9(B)(i). Thus, it is of no consequence

that, in assessing compliance with subsection (i), the Environmental Court did not explicitly find, for example, that Eastview explored alternative projects with lesser impacts on the parcel's primary agricultural soils. What matters is that the factual finding the court did make — namely, that the parcel does not support market-rate rents when used for agricultural purposes — reasonably supports its conclusion that it does not provide a reasonable return.

¶ 32. With respect to subsection (iii) of Criterion 9(B), Dr. Roemischer maintains that the Environmental Court erroneously concluded that the Project complied with its requirement that a development be "planned to minimize the reduction of agricultural potential" of the land on which it is located by, among other things, "providing for reasonable population densities, reasonable rates of growth, and the use of cluster planning and new community planning designed to economize on the cost of roads, utilities and land usage." 10 V.S.A. § 6086(a)(9)(B)(iii). The court's conclusion was erroneous, insists Dr. Roemischer, primarily because "the court made no findings" with respect to this subsection. This assertion is demonstrably incorrect.

¶ 33. The Environmental Court made numerous findings that support its conclusion that the Project complies with subsection (iii). For example, it found that the Project was specifically designed to incorporate cluster planning, situating its thirty cottages in a cluster around the main building thereby minimizing its overall footprint and its impact on primary agricultural soils. The court also found that, to serve the Project, municipal water and sewer lines need only be extended from an adjacent lot and will not be expanded beyond the development, economizing on the cost of establishing these services, which, in any event will be borne by Eastview. In turn, the proposed minimal expansion of essential utilities also decreases the likelihood that the Project will spur additional growth and development in the area. According to the Environmental Court, such growth is "encouraged when municipal services are extended over a multi-lot distance, thereby making development more attractive and affordable on the intervening lots." With respect to roads, the Environmental Court found further attempts at economizing and incorporating elements of community planning. Specifically, it noted that "the cottages will be accessed by the same drive that serves the [main building] along private interior roads" that are "aligned

close to the clustered cottages" to encourage the Project's residents "to walk to and from the cottages and the [main building]." Moreover, the court found that Eastview will pay for the minimal improvements needed on nearby roads outside the bounds of the development to mitigate the admittedly "minimal additional traffic" the Project is expected to generate. In light of these findings, we concur with Eastview that the Environmental Court's conclusion that the Project satisfied Criterion 9(B)(iii) was amply supported.

¶ 34. To further bolster her argument that the Project fails to comply with Criterion 9(B)(iii), Dr. Roemischer again cites *In re Times & Seasons* — this time for the proposition that any development that will transform two-thirds of the primary agricultural soils on the parcel slated for its development cannot comply with this subsection. Simply put, she misreads our decision in *In re Times & Seasons*. We noted that the former Environmental Board concluded "that the loss of two-thirds of the primary agricultural soils on the site constituted a significant reduction in the agricultural potential of such soils." *In re Times & Seasons*, 2008 VT 7, ¶ 11. The Board did not make its finding in connection with deciding whether the development in question complied with subsection (iii), nor did we rely on it in that context. Instead, the Board's finding was made in the context of assessing the threshold inquiry regarding compliance with Criterion 9(B) — whether the development would significantly reduce primary agricultural soils. See *In re Spear St. Assocs.*, 145 Vt. at 500, 494 A.2d at 141. Only after concluding that a development will indeed result in such a reduction must one examine Criterion 9(B)'s subsections. Dr. Roemischer's reliance on this portion of *In re Times & Seasons* is, therefore, misplaced.

¶ 35. Nor does the former Environmental Board's decision in *Southwestern Vermont Health Care Corp.* alter our opinion with respect to subsection (iii). Land Use Permit Application #8B0537, Findings of Fact, Conclusions of Law, and Order (Vt. Envtl. Bd. Feb. 22, 2001), at http://www.nrb.state.vt.us/lup/decisions/2001/8b0537-eb-fco.pdf. Dr. Roemischer asserts that, given the similarities of scope and design between the proposed development at issue in *Southwestern Vermont* and Eastview's proposal, we must conclude that the Project does not comply with Criterion 9(B)(iii) as did the Board. Her argument does not succeed, however, because she fails to detail the similarities of scope and design

between the projects that she maintains compel us to overturn the Environmental Court's conclusion regarding this subsection.

¶ 36. Additionally, we find no merit in Dr. Roemischer's assertion that the Environmental Court erred in finding compliance with Criterion 9(B)(iv), which requires that "the development or subdivision will not significantly interfere with or jeopardize the continuation of agriculture . . . on adjoining lands or reduce their agricultural . . . potential." 10 V.S.A. § 6086(a)(9)(B)(iv). The basis for her argument is twofold: first, the court erred in assessing the credibility of one of Eastview's witnesses whose testimony touched on this subsection; second, the court's only finding with respect to this subsection is insufficient to support its conclusion. Dr. Roemischer's attempt to discredit the testimony on this point of Eastview's witness, a former land use and policy analyst with the Vermont Agency of Agriculture, is hindered by conclusory argumentation, selective, out-of-context references to the record, and, most significantly, our standard of review. While it is true that this witness answered in the negative when asked if she conducted an "inquiry" into whether the Project complied with Criterion 9(B)(iv), other portions of her testimony — although not referenced by Dr. Roemischer — indicate that she visited the site several times in the process of reviewing Eastview's application and based her testimony on those visits. Also, it does not automatically follow, as Dr. Roemischer posits, that the witness' credibility was diminished merely because she did not speak with a farmer who leases adjoining lands and did not happen to know that corn had been grown on the land in the past. Even if it did, or had Dr. Roemischer explained why these purported flaws in the witness' testimony should be deemed deleterious to its overall weight, the Environmental Court enjoys broad discretion in assessing the credibility and weight of a witness' testimony, and we will not second-guess these determinations on appeal. See *In re Route 103 Quarry*, 2008 VT 88, ¶ 4. Furthermore, regardless of whether the Environmental Court's finding that Eastview is committed to imposing restrictions on residents' right to object to future agricultural uses of adjoining lands lacks support in the record, we find the evidence in support of the court's numerous factual findings on subsection (iv) to be sufficient to sustain its conclusion. There was no error.

## IV.

¶ 37. Dr. Roemischer's final argument is that the presiding judge acted with bias towards her in his evidentiary rulings and otherwise, and the cumulative effect of this bias was to deny her a fair trial. After reviewing the record, we conclude there is no support for this accusation.

*Affirmed.*