STATE OF VERMONT
ENVIRONMENTAL COURT

| | | |
|---|---|---|
| In re Verizon Wireless/Barton | } | Docket No. 6-1-09 Vtec |
| Act 250 Permit | } | (Appeal from District #7 Commission) |
| Telecommunications Facility | } | |
| (Appeal of Auger) | } | |
| | } | |

## Decision on the Merits

Vermont RSA Ltd. Partnership and Cellco Partnership, d/b/a Verizon Wireless, (collectively "Verizon" or "Applicant") applied for an Act 250 land use permit to erect a wireless communications tower and related infrastructure in Barton, Vermont. The permit application describes the project as including the construction of a 107-foot monopole tower disguised as a pine tree, as well as of an equipment building and related improvements, on land owned by David and Lucy Marvin at 497 Ingersoll Lane in Barton. When the District 7 Environmental Commission ("District Commission") granted Verizon an Act 250 permit for its project, Michael Auger and his mother, Jeannette Auger, (collectively "Appellants") filed a timely appeal with this Court.

Appellants, who jointly own property adjacent to the project site, insist that the proposed tower and support building will adversely affect their property and business interests. When the parties were unable to reach a voluntary resolution of their disputes, the Court conducted a site visit and merits hearing, the latter being conducted at the Superior Courthouse in Newport, Vermont. Present at the site visit and merits hearing were Appellant Michael Auger; his attorney, Vincent Illuzzi, Esq.; and Verizon's attorney, Pamela A. Moreau, Esq.

## Procedural Background

The parties filed a number of pre-trial motions, all of which the Court addressed in its various pre-trial entry orders and a decision. Because several of those orders and the decision impacted the legal issues that remained for the Court to address at trial, we provide the following procedural summary:

By their Statement of Questions, Appellants challenged the Verizon project's conformance with three Act 250 criteria: criterion 1, concerning water and air pollution (10 V.S.A. § 6086(a)(1)); criterion 8, concerning aesthetic impacts (10 V.S.A. § 6086(a)(8)); and criterion 10, concerning conformance with a local or regional plan

(10 V.S.A. § 6086(a)(10)). After Verizon filed a motion for partial summary judgment, and Appellants had an opportunity to respond, the Court determined that Appellant Jeannette Auger must be dismissed as an appellant, and that Appellant Michael Auger only had standing to prosecute a challenge under criterion 8 (aesthetics). The Court therefore dismissed Questions 1 and 3 from Appellants' Statement of Questions, thereby leaving Question 2 for adjudication at trial, and leaving Michael Auger as the only appellant in this appeal. See In re Verizon Wireless Barton Act 250 Permit, No. 6-1-09 Vtec (Vt. Envtl. Ct. Feb. 2, 2010) (Durkin, J.). By that same Decision, and based upon legal theories similar to the foundation for dismissing Questions 1 and 3, the Court denied Appellants' request to amend their Statement of Questions. Id. at 11.

The parties and the Court thereafter prepared for trial, which was eventually scheduled for November 3, 2010. Several discovery disputes arose in the course of trial preparations, all of which the Court resolved by various entry orders issued on September 23, 2010. During the course of the parties' trial preparations, Appellant Michael Auger disclosed that he intended to present evidence at trial concerning possible alternate sites for the Verizon project, including on lands not owned or controlled by Verizon. Verizon thereafter filed a motion seeking a limiting instruction concerning such testimony. By Entry Order filed October 15, 2010, the Court granted Verizon's request, having determined that the applicable standards for review of whether a proposed project conforms to Act 250 criterion 8 (aesthetics) do not authorize a reviewing court to consider alternate sites not owned or controlled by a project applicant. See In re Verizon Wireless Barton Act 250 Permit, No. 6-1-09 Vtec (Vt. Super. Ct. Envtl. Div. Oct. 15, 2010) (Durkin, J.). The Court considered, but ultimately rejected Appellant's motion for reconsideration and request for permission to file an interlocutory appeal. See In re Verizon Wireless Barton Act 250 Permit, No. 6-1-09 Vtec, Entry Orders on Motion for Reconsideration and Motion for Permission to Appeal (Vt. Super. Ct. Envtl. Div. Oct. 29, 2010) (Durkin, J.).

This appeal thereafter proceeded to its scheduled de novo merits hearing. The Court and the parties conducted a site visit on the morning of the merits hearing. While not regarded as producing evidence, the site visit provided a helpful contextual reference for the evidence that was admitted at trial. Based upon that evidence, the Court renders the following Findings of Fact and Conclusions of Law:

## Findings of Fact

### I. Project Site

1.      On February 25, 2008, Verizon applied for an Act 250 permit from the District Commission, seeking approval to erect a wireless telecommunications tower and related improvements in Barton, Vermont.  The proposal involved constructing a monopole tower, an equipment shelter, and other infrastructure on land owned by David and Lucy Marvin at 497 Ingersoll Lane.

2.      The 100-foot, free-standing tower would be disguised as a tall pine tree and situated in a field along the westerly edge of a wooded lot.  Artificial branches would be installed around the tower and extend beyond the top of the tower by approximately seven feet.  Twelve panel antennae would be located nine feet from the top of the tower, painted green, and concealed by the artificial tree branches.  The monopole would be painted brown to resemble a tree trunk.  The tower is designed to simulate a wolf pine, or a large pine tree that visibly stands above others in its vicinity, a not uncommon sight in this region.

3.      The tower/tree structure would be situated within an area measuring 100 feet by 100 feet that would be leased by Verizon from the land owner.  The tower would be located about 220 feet from the closest abutting property, which is owned by Appellants.  A prefabricated equipment shed, measuring 12 feet by 30 feet would be located at the base of the tower, inside an area secured by a chain link fence.  Electric service would be supplied to the area by utility lines to be installed along an access road that would travel from Roaring Brook Road and Ingersoll Lane to the equipment shed and intersect the northerly boundary of the Marvin property. A gas-powered electric generator would be located within the equipment shed to serve as a back-up source for electricity in the event of a power failure.

4.      Ingersoll Lane ends just north of the northern boundary to the Marvin property, along property now or formerly owned by Mr. and Mrs. Ingersoll.  The proposed tower access road would travel from the end of Ingersoll Lane, over the Marvin property, to the project site.  This access road would be approximately one-half mile long and about twelve feet wide.

5.      The project site is located within a clearing on or near the highest elevation of land on the Marvin property.  An overview of the project site, the Marvin property, and surrounding lands, town roads, and state highways is depicted in an attachment to

Verizon's Act 250 Application, which is labeled as "Orthophoto-Vicinity Plan (Sheet 1 of 9)" in Exhibit B. Verizon's application, with all its attachments, was admitted at trial as Exhibit B.

6.     Elevations of the project site and surrounding lands, together with the forested areas on and around the Marvin property, make a view of the project site from adjoining lands difficult or impossible. A view of all site improvements, with the exception of the top of the tower/tree structure, will be screened, shielded, and nearly impossible to view from all surrounding lands unless one walks with a determined eye to locate the project site and looks through the wooded area near the eastern boundary of the Marvin property.

7.     Verizon presented credible testimony from its project manager concerning this proposed cell tower, its siting, and its visual impacts. The project manager credibly testified that the Barton site was uniquely advantageous because while the site provided natural screening from all surrounding properties, little tree cutting or clearing would be necessary around the proposed facilities themselves because they would be located in an open field surrounded by the wooded areas. The project manager also stated that the access road from Ingersoll Lane would mostly follow the location and width of a pre-existing field or woods road and not exceed twelve feet in width. Once construction is complete, the access road would rarely be used; primary use would be for regular or emergency maintenance to the proposed tower and its support facilities.

8.     The elevation of the project site is 1,248.5 feet above sea level; the completed tower, including the artificial pine branches that will rise above it, will reach its highest elevation at 1,355.5 feet.

9.     The area surrounding the project site is heavily wooded with a mixture of various pine trees and underbrush. The average height of trees in the area near the project site is just about 50 feet. See "Detail Site Plan & Tree Elevations (Sheet 7 of 9)," attachment 1 to Act 250 Application (Exhibit B).

10.     Verizon maintains that many cell towers in Vermont along Interstate 91 have been constructed to resemble pine trees. While these structures are considerably more expensive to construct and maintain than conventional monopole towers, the tower/tree structures blend into their surroundings.

4

11. Appellant Michael Auger testified to his distain for such artificial structures. He noted that they are often easily identifiable, especially when they appear to rise high above the natural trees in the area. Mr. Augur noted that he has observed nearly all of the artificial tree towers along the interstate highway from White River Junction to Barton. However, when asked to estimate the number of such structures along the highway for this distance, his estimate was a small fraction of the artificial tree tower sites credibly revealed in the testimony from Verizon's project manager.

12. Verizon commissioned a detailed visual analysis report of its proposed tower project; a copy was included as Attachment 9 to Verizon's Act 250 permit application (Exhibit B). This report provides a credible analysis of the scenic qualities of the surrounding area and analysis of the project's visual impact on the surrounding area.

## II. District Commission Proceedings[1]

13. The District Commission first classified Verizon's application as a "minor application," pursuant to Act 250 Rule 51(A), after determining that there was a demonstrable likelihood that the project would not present a significant adverse impact under the applicable Act 250 criteria.[2] Soon after it published notice of the proposed permit, the District Commission received two requests for a hearing from area property owners.

14. The first request was received on May 14, 2008 from Vincent Illuzzi, who was acting in his individual personal capacity as both a resident in the same county as the project site and the owner of a commercial property developed with a communications tower in the vicinity of Barton Mountain.[3] Mr. Illuzzi requested the opportunity to present evidence as to why Verizon's proposal should not be considered a minor

---

[1] We recite a brief summary of the District Commission proceedings here, to provide needed procedural context. Since this appeal is heard on a de novo basis, pursuant to 10 V.S.A. § 8504(h), the factual and legal determinations made by the Commission do not impact upon our determinations here.

[2] Under Rule 51, a "minor application" may be granted a permit without a hearing or the issuance of findings of fact and conclusions of law. Act 250 Rule 51(A), (B)(3)(b). The District Commission need only convene a hearing if, after publication of a proposed permit, a person eligible for party status raises substantive issues on an Act 250 criterion in his or her request for a hearing. Id. Rule 51(B)–(D).

[3] Although Mr. Illuzzi now represents Michael Auger in this appeal, he originally participated in the proceedings below in his own capacity rather than in the capacity of Michael Auger's attorney. Mr. Illuzzi is not an appellant in this appeal. Some suggestion was made during pre-trial conferences that an alternate site for Verizon's project suggested by Appellant Michael Auger and Mr. Illuzzi was, in fact, owned by Attorney Illuzzi. However, no evidence detailing this or other suggested alternate sites was received at trial due to the Court's Entry Orders of October 15 and 29, 2011. Thus, the existence of suggested alternate sites not owned or controlled by Verizon, and whether such sites were owned by Attorney Illuzzi, was not at issue in these proceedings.

application. He also requested party status generally, but did not request party status under any specific criteria.

15. On May 16, 2008, Appellants jointly notified the District Commission that they supported Mr. Illuzzi's request for a hearing. In their May 16 letter, however, Appellants also failed to explicitly request party status for any of the Act 250 criteria. It appears that other letters were later sent to the District Commission regarding party status, but the Court has not been provided with copies of those correspondences.

16. After receiving these requests for a hearing, the District Commission concluded that a hearing on Verizon's proposal was necessary; it held a site visit and hearing on August 19, 2008.

17. After completing the hearing and its deliberations, the District Commission ultimately determined that the proposal complied with all applicable Act 250 criteria and issued Verizon Land Use Permit #7R1276,[4] authorizing the construction of the proposed monopole tower and related improvements.

18. Appellants filed a timely appeal with this Court on January 9, 2009.

### III. Appellants' Property and Surrounding Neighborhood

19. Appellant Michael Auger and his mother, Jeannette Auger, jointly own property abutting the Marvin property. The Auger property has a long history of significant agricultural use in this region. However, at the time of trial, the Augers had suspended their agricultural and other business operations at their property.

20. The Auger property and its agricultural activities are commonly known as Sugarmill Farm. The Sugarmill Farm was previously an established dairy farm that catered to the general public by selling produce and other local agricultural products, including maple syrup products. The Augers produced as much as 2,000 gallons of maple syrup annually.

21. The Augers had also established a business of attracting visitors to their property, who enjoyed observing their agricultural operations, purchasing agricultural products, and visiting areas on the Farm and surrounding woods for picnicking and hiking.

22. The Augers' property is located on the easterly slope of a hillside that faces towards Interstate 91. Their property and the surrounding area contribute to the scenic vista one enjoys while travelling in either direction on this section of I-91. The

---

[4] The Commission also issued Findings of Fact and Conclusions of Law on December 23, 2008.

Augers allow a Vermont Travelers Information Station to be maintained in the front parking area of their property, which is a short distance from the I-91 Exit 25 interchange.

23. The Augers' property also lies along the westerly edge of state highway 16, just south of the center of Barton, which is about one mile away. Several commercial developments exist within this distance of highway, particularly near the I-91 Exit 25 interchange.

24. Appellants' predecessors in title conveyed an easement upon the property to the Vermont Electric Power Company, Inc. ("VELCO") which allows for the construction and maintenance of high voltage electric transmission lines. VELCO currently maintains three parallel electric transmission lines on Appellants' property that run in a general east-west direct, south of the farmhouse and the other structures on Appellants' property. These transmission lines are strung between rows of wooden poles or towers[5] that hold the transmission lines about 50 feet or more above the ground.

25. The deeded easement authorizes VELCO to clear a swath of land of up to 250 feet in width for the maintenance and support of its lines. Mr. Auger credibly estimated that the area clear-cut for the existing transmission lines is about 100 feet wide and runs the entire width of his property, thereafter travelling to the west onto the Marvin property and to the east over I-91. A portion of these transmission lines is depicted in several of the photos Appellant Michael Auger admitted at trial. See Exhibits 5, 7, 8(b), and 9(b).

26. Verizon's proposed monopole tower would not be visible from the Sugarmill Farm farmhouse or related structures, but it would be visible from some of the picnicking and hiking areas on the Augers' property.

27. Travelers along I-91 would find it difficult to observe the proposed tower while driving, but may be able to see the top of the proposed tower/tree momentarily during their travels.

28. The proposed tower/tree would be about 3,300 feet from Appellant's farmhouse and about 4,800 feet from the westerly edge of I-91.

---

[5] We use the term "towers" here to denote a structure constructed of two or more tall wooden poles, with wooden cross timbers, used to hold the electric transmission lines high above the land.

**Discussion**

The sole issue remaining for determination in this de novo appeal is whether Applicant's proposed tower conforms to Act 250 criterion 8. Given that the number of criteria that may be considered in the course of a review of a state land use permit application can total up to 30,[6] one might assume that the review of only one criterion should be rather simple and straightforward. When that single criterion is criterion 8, however, such an assumption is often incorrect, for the determination to be made is whether a proposed project will cause "an undue adverse effect on the [aesthetics or] scenic or natural beauty of the area." 10 V.S.A. § 6086(a)(8).

Thankfully, our predecessor, the former Vermont Environmental Board, established guidelines for effectively conducting an evaluation of a project's conformance with criterion 8. These Board guidelines are commonly known as the "Quechee analysis," which derives its name from the project that had the unfortunate characteristic of being unduly adverse to its surrounding area and aesthetics. See In Re Quechee Lakes Corp., 154 Vt. 543, 546, 556–557 (1990) (affirming an Environmental Board determination that unauthorized changes to the project, including increased skylights and glazed windows, caused an "undue adverse" aesthetic impact).

The Environmental Board first articulated its standards for analyzing aesthetic impacts in its evaluation of an application to amend the Act 250 permit for the Quechee Lakes project that was first issued in 1972. See Re: Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law and Order, at 17–20 (Vt. Envtl. Bd. Nov. 4, 1985). While that Board determination was not directly reviewed by our Supreme Court, the Court has expressed its approval and admiration for the former Board's establishment of the Quechee analysis in several decisions since. See, e.g., In re McShinksy, 153 Vt. 586, 591–93 (1990). We provided a summary of the applicable decisions from the former Environmental Board and our Supreme Court in a contested de novo appeal concerning criterion 8: In re Eastview at Middlebury, Inc.. No. 256-11-06 Vtec, slip op at 13–15 (Vt. Envtl. Ct. Feb. 15, 2008) (Durkin, J.), aff'd, 2009 VT 98.

As noted in Eastview at Middlebury, No. 256-11-06 Vtec, slip op. at 14, the criterion 8 analysis that has since become known as the Quechee analysis has its

---

[6] See 10 V.S.A. §§ 6086(a)(1)—(10), including all subsections.

origins in another former Environmental Board decision: Re: Brattleboro Chalet Motor Lodge, Inc.. No. 4C0581-EB, Findings of Fact, Conclusions of Law and Order (Vt. Envtl. Bd. Oct. 17, 1984). In that proceeding, the former Board reviewed the aesthetic impacts of a motor lodge proposed to be constructed within 200 feet of Interstate 89, along an established scenic corridor. Id. at 7–11. The Board characterized its analysis in a manner that is helpful for our analysis of Verizon's proposed tower and related infrastructure:

> The term "undue" generally means that which is more than necessary-- exceeding what is appropriate or normal. The word "adverse" means unfavorable, opposed, hostile. "Scenic and natural beauty" pertain to the pleasing qualities that emanate from nature and the Vermont landscape. In short, through Criterion 8 the Legislature has directed that no project within our jurisdiction be approved if it has an unnecessary or inappropriate negative impact on the enjoyment of surrounding natural and scenic qualities.

Id. at 6. In its 1985 determination in Quechee Lakes Corporation, the Board used this description to craft a clear process, in the form of a multi-part test, for analyzing whether a project will have an undue adverse affect. Recently, our Supreme Court summarized the Quechee analysis steps as follows:

> [A] two-pronged approach [is employed] to determine if an application complies with criterion 8. First, it determines if the proposed project will have an adverse aesthetic impact, and if so, it considers whether the adverse impact would be undue. An adverse impact is considered undue if any one of the three following questions is answered in the affirmative: (1) does the project violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area; (2) does the project offend the sensibilities of the average person; and (3) has the applicant failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings.

In re Appeal of Times & Seasons, LLC and Benoit, 2008 VT 7, ¶ 8, 183 Vt. 336 (citations omitted).

Thus, we endeavor first to determine whether the proposed Verizon tower and support facilities will have an adverse aesthetic impact. To employ the parlance of Brattleboro Chalet Motor Lodge, we seek to determine if the proposed project is "unfavorable," "opposed," or "hostile" to its surroundings. For the reasons detailed below, we conclude that it is not, and is therefore in conformance with criterion 8.

Our analysis must begin with an acknowledgement of and sincere admiration for the scenic beauty of Appellants' property. Nestled at the base of a small hillside,

Appellants' property and those adjacent to it on Route 16 are clear contributors to the quality scenic corridor for which our Northeast Kingdom is so admired. But any observer of the area surrounding the proposed Verizon project site, or the context in which the project would be located, must acknowledge that the area is no stranger to development. Quite the contrary is true. Commercial development exists at the nearby I-91 Exit 25 interchange and Barton village center, some of which is only several hundred yards away. Appellants' property plays host to highly visible, high-power electric transmission lines. Thus, the context against which we test Verizon's proposed project is one where the proximity of an interstate highway, I-91, has brought with it commercial development, but also one where the overall scenic beauty has not been corrupted by the current commercial development.

The development that Verizon proposes is quite dissimilar to the multi-unit motor lodge that the former Environmental Board found so objectionable in Brattleboro Chalet Motor Lodge. That proposal was massive and located within 200 feet of I-89; the Verizon proposal is minor by comparison and is designed to replicate a tall pine tree, a not uncommon site in the region. These two projects appear to be polar opposites: as much as Brattleboro Chalet Motor Lodge exemplifies an aesthetically adverse project, the Verizon tower exemplifies an aesthetic symmetry with its surroundings. The fact that the Verizon tower will be located nearly 4,800 feet away from I-91 and 3,300 feet away from Appellant's farm house, and hardly even visible from those sites, adds to its aesthetic congruity.

Verizon is to be commended for its efforts to eliminate the materially adverse aesthetic impacts that its project might otherwise bring to this area. In developing the proposed infrastructure, Verizon will cause little earth disturbance and little or no tree cutting. Its presentation convinced the undersigned that the design of its tower will replicate a pine tree form that is not uncommon in this region. True, the proposed tower will not be invisible. Idle minds driving down an interstate (the undersigned included) often engage in the contest of trying to identify all the nearby cell towers, poorly masked as artificial trees. This game is made easy by the tower/trees that rise awkwardly above neighboring trees, sometimes by over 100 feet. But Verizon's presentation proved that, at least in northern Vermont, we may be losers at this contest more often then we know. Mr. Auger learned this after his own testimony

10

showed that he was only aware of a small fraction of the artificial tree towers installed by Verizon along the northerly sections of I-91.

Based on the evidence Verizon submitted at trial, we find credible support for a conclusion that Verizon's cell project, as proposed, fits with the surrounding area. The visual analysis report Verizon commissioned from its landscape architect provides a convincing summary of the aesthetic qualities of the surrounding area and the impacts of the proposed tower project upon those surroundings. The landscape architect concluded that the aesthetic impact of the proposed tower project would not be averse to its surrounding or, if it were determined to be adverse, its adverse impact would not be undue.

In reply to Verizon's evidence, Mr. Auger sincerely stated his disdain for such artificial structures and his fears for the adversities that this tower may bring to his property and business, if and when he succeeded in reinvigorating his commercial ventures. But his disdain and concerns ring hollow; they appear to have little factual foundation. In contrast, Verizon's presentation remained convincing.

When an applicant has made an adequate threshold showing under criterion 8, thereby fulfilling its evidentiary burden of proof, the evidentiary burden then shifts to the opposing party to show that the project will have an adverse impact. 10 V.S.A. § 6088(b). Mr. Auger failed to make this showing. Thus, we conclude that Applicant has shown that its proposed tower project, if constructed and maintained according to the submitted site plans and attachments, will not have an adverse impact on the aesthetics, or scenic or natural beauty of the area.

Following the Quechee analysis, as established by the former Environmental Board, our conclusion is that no adverse impact under criterion 8 will be caused by this project. This ends our analysis, since we need not render a determination of whether the adverse impact is "undue" when we have concluded that there is no adverse impact. We therefore conclude that the proposed Verizon tower, designed to resemble a pine tree, together with its related support facilities, conforms to Act 250 criterion 8.

## Conclusion

For all the reasons more fully discussed above, we conclude that the Verizon tower, designed to resemble a wolf pine, and together with its related support facilities,

conforms to Act 250 criterion 8.  Since criterion 8 is the only criterion remaining to be addressed in this appeal, we conclude that Verizon's application must be **APPROVED**.

These proceedings are remanded to the District 7 Environmental Commission, solely to complete the ministerial act of re-issuing Act 250 Permit #7R1276 in conformance with this Merits Decision and the unappealed determinations of the District Commission.

A Judgment Order accompanies this Merits Decision.  This completes the current proceedings pending before this Court.

Done at Berlin, Vermont, this 21st day of April 2011.

_____
Thomas S. Durkin, Environmental Judge