# STATE OF VERMONT

SUPERIOR COURT                                ENVIRONMENTAL DIVISION
Vermont Unit                                    Docket No. 173-12-13 Vtec

Killington Resort Parking Project Act 250
Amendment Application

## Decision on the Merits

Killington/Pico Ski Resort Partners, LLC ("Applicant")[1] seeks approval for the reconfiguration of some of its parking facilities at the Killington Resort in the Town of Killington. The proposed project also calls for a reconfiguration of a portion of the parking lots at the Killington Grand Hotel, a new private access road and related improvements, and improvements to certain landscaping and stormwater treatment facilities. The various proposals encompassed by this pending application are hereinafter collectively referred to as the "Parking Project." When the District #1 Environmental Commission (the "Commission") approved the Parking Project application and issued an Act 250 permit, Stephen Durkee and entities owned or controlled by Mr. Durkee—Mountainside Properties, Inc.; Mountainside Development, Inc.; Fireside Properties, LLC; and Killington Village Properties, Inc. (collectively, "Appellants")—appealed to this Court. Pinnacle Condominium Association ("Pinnacle") is an Interested Party in this appeal.

Applicant is represented in this appeal by Christopher D. Roy, Esq.; Appellants are represented by Nathan H. Stearns, Esq. and C. Daniel Hershenson, Esq; and Pinnacle is represented by Jon S. Readnour, Esq. Also appearing in this appeal are the Vermont Agency of Natural Resources ("ANR"), represented by Elizabeth Lord, Esq. and the Vermont Natural Recourses Board ("NRB"), represented by Gregory J. Boulbol, Esq.

The Parking Project application coincides with a master plan application by a separate owner/developer—SP Land Company, LLC—concerning substantial new construction at the

---

[1] MTB Killington, LLC; AMSC Killington, LLC; and SP II Resort, LLC filed the initial application for the Parking Project, but subsequently transferred ownership to Killington/Pico Ski Resort Partners, LLC. Any further reference to Applicant shall apply to the current owner and applicant, Killington/Pico Ski Resort Partners, LLC.

Killington Ski Resort; the master plan proceedings have also been appealed to this Court and are the subject of a separate appeal, Docket No. 147-10-13 Vtec.[2]

## Preliminary Issues

I.    Standing

Appellants filed their Statement of Questions on January 13, 2014, listing nine legal issues for the Court to address in this de novo appeal.  Applicant then filed a motion challenging all Appellants' standing under Criteria 5 and 9(K) and challenging all but Appellant MPI's standing under Criterion 8. By decision dated August 5, 2014, the Court provisionally affirmed Mr. Durkee's party status under Criterion 5, but rejected all other Appellants' party status under this Criterion.  The Court also rejected all Appellants' party status under 9(K).  The Court granted Applicant's motion to dismiss all of the challenged Appellants, other than MDI, under Criterion 8.

No credible evidence was presented at trial that convinced the Court to revise its party status determinations concerning the denial of party status under Act 250 Criterion 8 or 9(K). Since that party status determination has now become final, we conclude that Appellants' Questions that relied upon their standing to raise legal issues under criterion 9(K)—Questions 3, 7, and 8—must be **DISMISSED**.

With regard to our provisional ruling under Criterion 5, Mr. Durkee owns properties at 2134 Killington Road and 2023 Killington Road, which are located 1.1 miles and 1.2 miles, respectively, below (north of) the Parking Project.  Since he personally lives in Mendon, we find it difficult to discern what purpose specific to his properties requires him to drive past those properties and therefore be impacted by the Parking Project.  Stated differently, as to the two properties Mr. Durkee owns in his personal name and for which he requested and received provisional party status under Criterion 5, we are having difficulty discerning what impacts particular to these properties may be felt.  Rather, it appears that Mr. Durkee is impacted no differently that other members of the general public who travel along Killington Road in the vicinity of the Parking Project.  However, when we granted Mr. Durkee party status under

---

[2] One factor influencing the Court's decision to not consolidate these two matters is that different parties have appeared in each appeal.  See In re Killington Village Master Plan Application Appeal, No. 147-10-13 Vtec, slip op. at 1, n. 1 (Vt. Super. Ct. Envtl. Div. Aug. 6, 2014) (Durkin, J.).

Criterion 5 due to possible impacts upon his two properties, we noted that "Mr. Durkee's allegation that the Parking Project will result in additional turning movements and increased traffic congestion is sufficient to establish a reasonable possibility that the Parking Project could harm his particular interests." In re Killington Resort Parking Project Act 250 Appeal, No. 173-12-13 Vtec slip op. at 7 (Vt. Super. Ct. Envtl. Div. Aug. 5, 2014).

As noted below in our Discussion section, we conclude that there is insufficient factual foundation to support Mr. Durkee's concerns. But that merits conclusion is not a sufficient basis for reversing our grant to Mr. Durkee of party status under Criterion 5. Rather, as we have stated before, when an individual seeks party status, they need only satisfy an initial showing that the proposed project "may" impact them as they fear; they do not carry the burden at the initial stage of party status evaluation to show that the project definitely "will" impact them as they fear. In re Pion Sand & Gravel Pit, No. 245-12-09 Vtec, slip op. at 7 (Vt. Super. Ct. Envtl. Div. July 2, 2010) (Durkin, J.). It is for this reason that we decline to revise our decision to grant Mr. Durkee party status under Criterion 5 as to possible impacts upon his two properties on Killington Road. We therefore conclude that Mr. Durkee has permanent (not provisional) standing under Criterion 5.

II.     Settlement Between Applicant and Pinnacle

The parties engaged in considerable good faith efforts to voluntarily resolve their differences. Those efforts continued even after the Court had closed the evidence at the end of trial; their efforts resulted in an agreement between Applicant and the Pinnacle Condominium Association, Inc. ("Pinnacle") that resulted in Pinnacle withdrawing its objections to the proposed Parking Project improvements, subject to some revisions to the proposed access way improvements, known as "Road H," being admitted into evidence, post-trial, and accepted by the Court in its Merits Decision. Applicant formally moved for admission of the revised plans on November 4, 2015. The Court initially afforded all other parties thirty days in which to state their objections to the Court admitting the revised site plans for Road H. See In re Killington Resort Parking Project Act 250 Appeal, No. 173-12-13 Vtec, slip op. at 12 (Vt. Super. Ct. Envtl. Div. Dec. 11, 2015) (Durkin, J.). Upon receiving responses from Appellants and the NRB, as well as a reply memorandum from Applicant, the Court determined that no party objected to the

3

Court accepting the revised site plans for Road H without a further evidentiary hearing and therefore granted Applicant's motion. Copies of the revised plans were attached to Applicant's original November 4, 2015 motion as Exhibits A, B, and C. See In re Killington Resort Parking Project Act 250 Appeal, No. 173-12-13 Vtec, slip op. at 4 (Vt. Super. Ct. Envtl. Div. Jan. 28, 2016) (Durkin, J.).

While the NRB did not object to admitting the revised plans into evidence, it did argue that the revisions required remand to the Commission. The Court declined to remand the matter, reasoning that the revisions were not significant, they were made in response to particular objections, and the changes would only affect one party who was not then before the Court (the Mountain Inn), and The Mountain Inn already had notice of these proceedings and elected not to participate.

Based upon the credible evidence presented at trial, much of which was put into context by the site visit that the Court conducted with the parties, as well as the revised plans for Road H and related improvements admitted post-trial, the Court renders the following Findings of Fact and Conclusions of Law, as well as a Judgment Order that accompanies this Merits Decision.

**Findings of Fact**

I.      Pending Application

1.      The Killington Ski Resort (the "Resort") has operated for several decades on a large expanse of land in what is now known as the Town of Killington.[3] The pending application only concerns lands in a portion of the Resort area adjacent to what has been known as the main base lodge area.

2.      Due to the longevity and relative success of the Resort, many separate residential and commercial developments related to the ski area have been permitted and completed on or near the Resort properties.

3.      For many years, the Resort has maintained several large parking areas that are used by day skiers and other visitors to the Resort. Two of those parking areas are known as the

---

[3] At the time that the Killington Ski Resort began operation, the Town was known as Sherburne. The Town completed the change of its name to the Town of Killington in the 1980s.

Ramshead Lot and the Snowshed Lot, which together are capable of hosting about 1,276 vehicles. Both of those lots are graveled areas with generally unmarked parking spaces; visitors are guided on where to park by intermittent posts and personnel that are posted in the parking areas during busy days.

4. The Ramshead and Snowshed lots are gravel, with nearly no landscaping or screening and with little definition to the lots except for the exterior boundaries. These existing lots are visible from the resort base areas, portions of the Killington Grand Hotel, many ski slopes, and nearby residential and commercial developments.

5. The existing Ramshead and Snowshed parking lots are depicted on some of the plans presented in support of the pending application, although the existing lots are difficult to ascertain because they are only shown by light gray markings. The existing lots are more easily seen on a Google Earth screen shot admitted at trial as Exhibit PCA-1. Although these lots are not labeled, they appear as the two large white areas on Exhibit PCA-1 in the upper left quarter of the Exhibit.

6. On February 28, 2012, then-owners MTB Killington, LLC; AMSC Killington, LLC; and SP II Resort, LLC filed an Act 250 permit application with the Commission seeking approval for their Parking Project, which consisted of new day-skier parking lots, realignment of a portion of Killington Road, and reconfiguration of a portion of the Killington Grand Hotel parking lot and associated stormwater treatment systems at the Resort. In the course of the Commission proceedings, project ownership was transferred to the current owner/Applicant: Killington/Pico Ski Resort Partners, LLC.

7. The overall site plan admitted at trial as Exhibit A provides a helpful demarcation of the areas proposed to be developed in the pending application; these areas are outlined in a dashed red line, including the portion of the Killington Grand Hotel parking lot that is to be reconfigured.

8. The road running from the bottom to the top of Exhibit PCA-1 is Killington Road, which serves as the main access road to the Killington Ski Resort. As depicted on Exhibit PCA-1, Killington Road runs in a general north-to-south direction, with north being towards the bottom of the Exhibit and south being to the top of the Exhibit, as noted on the lower left corner of the

5

Exhibit. Killington Road is a town highway from its intersection with U.S. Route 4 to a point just below (north of) the proposed new parking areas. Killington Road thereafter is a private roadway, used and maintained by various developments, including the Resort.

*a. Proposed new parking lots*

9. The pending application proposes to replace the Ramshead and Snowshed parking lots with new lots, which will be located on currently undeveloped adjacent lands just below (north of) the existing lots. The new parking areas are identified as Lots C through J on the project site plans admitted at trial as Exhibit B, Sheet C-2.03 and C-2.04.

10. The work on the Killington Grand Hotel parking lot is essentially a reconfiguration of the existing parking lot. The total size of the Hotel parking area will not increase, nor will the lighting for the parking area change. The reconfiguration will add 28 parking spaces to the lot.

11. The proposed Parking Project also calls for a realignment of Killington Road near the Ramshead and Snowshed lots, as depicted on Exhibit B, Sheet C-2.02. The areas at and around where the Ramshead and Snowshed lots are now located are proposed to be occupied by an altered Killington Road. The altered Killington Road will contain a roundabout at the intersection of Killington Road and East Mountain Road, which will be surrounded by new developments, including new base lodges. This roundabout and the development surrounding it are not the subject of this Act 250 application, but rather are the subject of the separate master plan application and subsequent specific development permit applications. We provide this summary here for contextual purposes only.

12. The proposed parking lots C through J will cause about 24± acres that are mostly wooded to be clear-cut and topped with gravel, an impervious surface. This area will also contain lighting for the parking areas, landscaping, and plantings that will add to the aesthetic screening already provided by the trees and brush that will remain in the areas surrounding the proposed parking lots.

13. While these 24± acres are currently wooded, they are surrounded by a number of other developments, including the Pinnacle Condominium Development, The Mountain Inn, the Cascades Lodge, and the Mountain Green Condominium Development. The Killington golf course, lifts, ski trails, hotels, multiple condominium developments, restaurants, nightclubs, ski

6

shops, and other commercial enterprises are located with a mile or so of the proposed development.

14. All of the proposed parking lots will have designated parking areas, travel lanes, and pole-mounted lights to illuminate the parking areas.

15. The proposed parking lots, stormwater treatment system, Road H improvements, and Killington Road realignment are all located in the Ski Village II District, as defined by the Town of Killington Town Plan, a copy of which was admitted at trial as Exhibit S. The reconfiguration of a portion of the parking lot at the Killington Grand Hotel is located in the Ski Village District of the Town Plan.

16. All areas proposed for development in this application are included in the areas identified in the Rutland Regional Plan (admitted at trial as Exhibit T) as a "High Density Development" area. See Ex. T at 31, map entitled "Rutland Region Future Use of Land." In fact, the area proposed for this development is one of only five areas in all of Rutland County identified as a "Sub-Regional Center" for future development under the Rutland Regional Plan.

### b. Road Realignment & Traffic Congestion

17. The portion of Killington Road that is proposed to be reconfigured as part of this application begins on the southern end at a proposed curb cut that will serve as an entrance to Lot G and ends just above the planned intersection with a new private roadway, identified as Road H, that will serve as an entrance to Lots C, D, E, and F.

18. The proposed Road H will be a new private road that runs east/west, connecting Killington Road with Old Mill Road, which is an existing private roadway that serves as access to other existing developments and to a wastewater treatment plant.

19. By locating the new day skier parking below (north of) the main base area, the proposed plan will allow day skiers and other visitors to avoid driving into the main base area, where the day skier parking is currently located. Shuttle buses will provide access from the new parking areas to the main base area. The proposed Road H will allow day skiers and other traffic to also access East Mountain Road via Old Mill Road, which provides an alternate access to and from the Resort area to the south and Route 4 to the north.

7

20. Road H will also serve as an access to two of the new parking lots that will adjoin Road H: Lots C and D. Guardrails will be installed along portions of Road H, as depicted on the revised site plans, particularly where the grade of the land below the roadway becomes steep.

21. A sidewalk is also planned along Road H to serve pedestrians.

22. Pinnacle initially objected to the alignment of Road H and the sidewalk, asserting that with Road H directly adjacent to its property, the proposed landscaping would be insufficient to mitigate the adverse aesthetic impacts of this new roadway.

23. In response to Pinnacle's concerns and objections, Applicant revised the portion of its plans relating to Road H and the adjacent sidewalk: Road H and the sidewalk will essentially swap locations, so that the sidewalk will be nearest to the Pinnacle development (as shown on the revised plans offered and admitted post-trial per the consent of the parties).

24. The sidewalk will provide pedestrian access between the proposed parking areas and sidewalks along Old Mill Road, which in turn provide pedestrian access to the Resort center.

25. Applicant has also pledged to install and maintain additional tree plantings and landscaping on either side of Road H and the sidewalk, in an effort to help further mitigate any possible adverse aesthetic impacts. All such additional landscaping is depicted on the revised plans.

26. Applicant has also proposed to install intersection and directional signs at the end of Road H, where it joins with Old Mill Road, all as depicted on the revised plans. The stop sign at this intersection will be relocated, so as to accommodate a cross walk at the end of Road H, and a "No Outlet" sign will be installed on the eastern side of Old Mill Road north of the intersection with Road H.

27. There are two internal intersections proposed along Road H between the Killington and Old Mill Road intersections. To the west, near Road H's junction with Killington Road, Road H intersects with a small north/south access way connecting Lots C and E. To the east, near Road H's junction with Old Mill Road, Road H intersects with a small access way connecting Lot D and The Mountain Inn parking lot.

28. As currently configured, day skiers and other visitors drive their vehicles up the full length of Killington Road (both the public and private portions of the roadway) to the existing

8

Ramshead and Snowshed parking areas adjacent to the existing main base area. Once the proposed new day skier parking lots are constructed, visitors will be able to enter the new parking areas below (north of) the main base area, thereby avoiding the stretch of Killington Road between the proposed Road H and the entrance to the main base area.

29. The distance between the main base area and the proposed Lot C is about 0.2 miles; for the proposed Lot J, the distance is about 0.5 miles. Applicant will provide shuttle bus service from the new parking lots to the lift areas. Visitors can walk from the new lots to the base lodge and lift areas or take one of the shuttle buses Applicant will provide.

30. Some visitors may choose to continue to drive up Killington Road to the main base area, so as to drop off some passengers. Many will prefer to park in the new parking lots, so as to avoid traffic congestion at the main base area, particularly during busy winter weekends.

31. The proposed shuttle bus service will help reduce the volume of traffic on Killington Road between the new parking lots and the main base area because every shuttle bus will carry a number of vehicle drivers and their passengers to the main base area. The shuttle buses will operate on a circular route, using Killington Road, the internal roads around the main base area, Old Mill Road, and the proposed Road H. This proposed shuttle bus route will provide further reductions to the vehicular traffic on Killington Road.

32. The Parking Project itself does not increase day skier parking capacity at the Resort; this Project effectively replaces existing day skier parking facilities with new parking areas in what is best described as an infill development project. The proposed Parking Project will not increase traffic on the adjoining public or private roadways. In fact, for the reasons stated above, the proposed parking lots will likely reduce traffic on Killington Road between the project site and the main base area.

*c. Intersection Configuration and Traffic Safety*

33. At its intersection with Killington Road, Road H will have three travel lanes: one lane for traffic travelling from Killington Road onto Road H and two travel lanes for traffic travelling from Road H onto Killington Road. The southern (left-hand) outlet lane on Road H will be for traffic turning left and intending to travel to the Resort, and the northern (right-hand) lane will be for traffic turning right towards U.S. Route 4 and Vermont Route 100.

34.     Similarly, Killington Road will have a dedicated left-hand lane for southbound traffic making a left-hand turn onto Road H.  A second, right-hand lane on Killington Road will allow through traffic to continue to travel up to the main base area.  In this area, and continuing to the main base area, Killington Road will have two northbound lanes travelling away from the main base area.  This will allow through traffic to safely continue past vehicles making a right-hand turn onto Road H.

35.     Road H will be paved, and the travel lanes will be marked, including arrows painted on the pavement to mark the direction of intended travel at the intersection with Killington Road.

36.     At the intersection of Road H with Old Mill Road, there will be sufficient sight distances to allow drivers to safely pass through this private road intersection.  Most traffic travelling from Road H and onto Old Mill Road will likely be turning right so as to travel in a southerly direction, towards the main Resort center, the Grand Hotel, and East Mountain Road.

37.     Travelers on Road H heading west, towards Killington Road, will be afforded sufficient sight distances to the north for the Road H driver to turn onto Killington Road in a safe manner, so as to avoid oncoming traffic; achieving adequate sight distances to the south will require some clearing of vegetation and snow pile-up along the eastern shoulder of Killington Road. Sight distances are sufficient for southbound Killington Road drivers to safely turn left onto Road H.

38.     There will be another access to the proposed parking area from Killington Road in the vicinity of Lot G.  At that intersection, there will be sufficient sight distances in both directions on Killington Road to provide safe ingress and egress from Lot G and the adjoining parking lots.

*d.  Screening, Landscaping, and Lighting*

39.     Large areas of trees, shrubs, and other natural growth will remain along the eastern and western boundaries of parking lots C through J, including along the full length of Killington Road.  These existing trees and forest growth will screen the view of the proposed Lots C through J from most adjoining and off-site areas.  One of the buildings in the Pinnacle condominium development will have a partial view of Lot D.

40.     Off site, the only views of these new parking areas will be from a brief stretch of Killington Road as vehicles travel downhill (north) towards Routes 4 and 100; the only other off-

10

site view may be from the MDI property off of Mountainside Drive, but that view will be partially obscured and from a considerable distance. The new parking areas may be partially and briefly seen by skiers on the Resort ski trials. The existing parking areas are also visible from ski slopes.

41.     Additional tree planting and other landscaping will be completed along Road H, its sidewalk, and along the exterior portions of the new parking lots. These new plantings, detailed in Applicant's landscaping plans, will provide additional screening for the proposed new parking lots.

42.     There will also be downcast lighting from light poles installed in the parking lots, as depicted on Applicant's revised site plans. This lighting will provide sufficient illumination for visitors during short mid-winter days. However, the light fixtures will block a direct view of the source of the illumination from outside the parking lots.

43.     Internal sidewalks and walkways will also be installed within the proposed parking lots, which will direct day skiers and other visitors to the shuttle bus pick up points. The internal walkways will also provide visitors access to the sidewalks that will lead to the main Resort center.

> e. *Stream, Stormwater, and Erosion Impacts*

44.     By virtue of the very nature of the Killington Ski Resort and its surroundings, development may have significant impacts upon the high-altitude natural areas at the Resort and adjacent natural resources, including streams and the ground and surface waters that flow into those streams. This particular development does not impact the most pristine natural areas, since it is located at the lowest elevations of the Resort. While the area proposed for Parking Lots C through J is presently undeveloped, that area is surrounded by existing commercial and residential developments. The existing center of the Resort development is only a short distance away.

45.     There is only one recognized stream near the Parking Project: the Roaring Brook. There is no stream or water course located on the lands to be developed.

46.     Roaring Brook travels from south to north, beginning on the opposite side of Killington Road from the Parking Project areas. It passes underneath Killington Road about 100 feet from the northwestern corner of Lot G.

47.     Thereafter, the area to be developed for the proposed Lots H, I, and J parallel the top of the eastern bank of the Roaring Brook, at a distance of at least 75 feet. The site plan depicted as Exhibit B, Sheet C-3.04 accurately depicts the proximity of the proposed development to the top of the Roaring Brook's banks.

48.     The lands between the Roaring Brook and Lots G, H, I, and J are mostly wooded and brush-filled. The ground cover in this area provides excellent filtration for surface and ground water that flows in this area. The lands on the opposite side of the Roaring Brook, between the Brook and the existing Killington Road, are also thickly wooded.

49.     The proposed Lot J is the lowest lot by elevation. Below Lot J is the area proposed to host a large stormwater "wet pond." This pond will detain and treat stormwater that flows from the proposed lots, as well as stormwater that may flow from other existing and proposed developments above (south of) this wet pond.

50.     The proposed wet pond includes an outflow structure that will protect the wet pond during extreme stormwater flow events by directing the outflow of treated water from a specific location, rather than allowing it to breach the banks of the wet pond. A forty-foot portion of this outflow structure is less than fifty feet from the top of the bank of the Roaring Brook, as depicted on Exhibit B, Sheet C-3.04 and C-4.04.

51.     The treatment that this wet pond provides will be a significant improvement to existing circumstances, since the existing day skier parking areas do not have stormwater treatment facilities to serve them.

52.     Applicant applied for and received ANR Stormwater Discharge Permit #6774-INDC ("Stormwater Construction Permit"). This permit was issued on May 23, 2013; a copy of the Stormwater Construction Permit was admitted at trial as Exhibit F. It governs the construction of Applicant's proposed stormwater detention pond and treatment systems.

53.     The Stormwater Construction Permit was not appealed and has therefore become final.

54.     The Stormwater Construction Permit details the location, size, and manner of construction of the various stormwater treatment systems.  The proposed treatment systems, including the stormwater detention wet pond below Lot J, are designed and permitted to address stormwater runoff from all components of the Parking Project, as well as certain improvements addressed in the master plan proceedings.  The Stormwater Construction Permit establishes erosion prevention and sediment control requirements for the construction of the proposed improvements; inspection, discharge sampling, corrective action, and recordkeeping requirements for the new stormwater treatment systems; and the transfer and termination requirements of the Permit.

55.     Applicant also applied for and received ANR Stormwater Discharge Permit #6774-INDS ("Stormwater Operational Permit"); that Permit governs the operational parameters for Applicant's proposed stormwater treatment systems, including the Parking Project stormwater detention wet pond.  A copy of this Permit was admitted at trial as Exhibit G.

56.     The Stormwater Operational Permit was also issued on May 23, 2013.  No appeal was filed from this permit determination.

57.     The Stormwater Operational Permit authorizes the permittee, its successors, and assigns to allow or cause the discharge of stormwater runoff from the impervious surfaces that will be created by the Parking Project and other components of the master plan.  Specifically, this Permit memorializes the ANR determination that stormwater discharges from the identified development areas satisfy applicable state rules and regulations regarding water quality due to the stormwater's treatment through grass channels, underground sand filters, dry detention ponds, wet detention ponds, disconnected overland sheet flow, and natural area conservation, and will not increase the sediment load or hydrologic load of receiving waters.

58.     Mr. Durkee expressed several concerns that the proposed development will increase the flow of stormwater into the Roaring Brook, perhaps even causing overflows that may impact the Durkee properties located below (north of) the Parking Project, particularly the property he owns at 2023 Killington Road.  The Roaring Brook runs along or near that property.

59.     Mr. Durkee was provided an opportunity at trial to provide testimony and other evidence to refute the ANR determinations that the Project will not increase the hydrologic

13

load of the receiving waters. Mr. Durkee did not introduce any new evidence (testimony or exhibits) to support his concerns, but tried to support his concerns through cross-examination.

60. In addition to its permits, Applicant introduced credible evidence through testimony of a stormwater expert, Jeffrey Nelson, that the Project and its stormwater system will preserve the natural condition of the Roaring Brook during significant storm events, and that even during such significant storms, the proposed development will not cause flooding in the Roaring Brook.

II. <u>Appellants' Properties.</u>

61. Pinnacle is an association of owners of residential condominiums located in six buildings adjacent to the proposed Lots D and E. Building A in the Pinnacle Development is the closest Pinnacle building to any of the proposed lots.

62. Appellant Stephen Durkee owns properties at 2134 Killington Road and 2023 Killington Road in Killington, Vermont. The property at 2134 Killington Road includes a single residence, and the property at 2023 Killington Road includes a market/office building and associated parking. Each of these properties is located below (north of) the proposed Parking Project. These properties are located 1.1 and 1.2 miles, respectively, from the proposed Parking Project site; these two properties are the closest of Appellants' properties to the Project site.

63. Mr. Durkee owns a controlling interest in Appellants Mountainside Properties, Inc.; Mountainside Development, Inc.; Fireside Properties, LLC; and Killington Village Properties, Inc. (collectively, the "Durkee Entities").

64. Appellant Mountainside Properties, Inc. ("MPI") owns properties located on East Mountain Road and on U.S. Route 4 in Killington, Vermont. Both MPI properties are undeveloped and are too far away to have views of the proposed development.

65. Appellant Mountainside Development, Inc. ("MDI") owns property at Mountainside Drive in Killington, Vermont. The MDI property is an undeveloped single residential lot within a subdivision.

66. Appellant Fireside Properties, Inc. ("Fireside") owns property at 1128 Killington Road in Killington. The Fireside property includes a hunting lodge and associated cabins.

67. Appellant Killington Village Properties, Inc. ("KVP") owns commercial property at 923 Killington Road in Killington, Vermont.

14

68.     Mr. Durkee resides at 337 Old Elbow Road in Mendon, Vermont.  Mr. Durkee regularly travels Killington Road in the area of the Parking Project in order to access, manage, and inspect the properties owned by the Durkee Entities.

## Conclusions of Law

In this appeal, we are charged with addressing the legal issues that are presented for the Court's consideration that remain for consideration at trial.  V.R.E.C.P. 5(f).  As we note in the Preliminary Issues Section, above, Appellants have standing to raise legal challenges under four of the Act 250 criteria and sub-criteria enumerated in 10 V.S.A. § 6086(a): Criterion 1(E) (concerning impacts upon streams and waters); Criterion 5 (concerning traffic impacts); Criterion 8 (concerning aesthetic impacts); and Criterion 10 (concerning conformance with the applicable town and regional plan provisions).  The District Commission's legal determinations that the Project conformed to other applicable criteria were not appealed and have therefore become final.  V.R.E.C.P. 5(f); 10 V.S.A. § 8504(h) (limiting the legal issues to be heard in a de novo appeal to those that have been raised in an appellant's statement of questions).

## I.     Scope of Review

Before we embark on our review of the applicable four criteria, we must address some confusion about the relationship between the pending application and the related but separate master plan application, the latter being the subject of a separate appeal to this Court, Docket No. 147-10-13 Vtec.

While the two appeals concern developments on adjacent properties, the applications being reviewed are very different.  At their most basic form, this Parking Project appeal concerns an application for an Act 250 permit; the master plan application principally seeks positive factual findings and legal conclusions for several different projects that are proposed to reconfigure, reconstruct, and expand the developments at the village core of the Killington Resort.

Addressing Appellants' suggestion first, it is true that, outside the master plan context, when an Act 250 permit application seeks approval for only one part of what is really a coordinated development, we look to the cumulative impacts of the development as a whole in our Act 250 review.  See Re: Albert and Doris Stevens, No. 4C0227-3-EB, Findings of Fact,

15

Conclusions of Law, and Order, at 3 (Vt. Envtl. Bd. July 28, 1990). But master plan review is meant to provide conceptual approval of a large-scale project. See Re: Green Peak Estates, Inc., No. 8B0314-2-EB, Findings of Fact, Conclusions of Law, and Order, at 8 (Vt. Envtl. Bd. July 22, 1986). Individual phases of the project may either then be reviewed separately in individual permit application proceeding or as part of a master plan proceeding, when a specific phase of a master plan development seeks Act 250 permit approval. See Act 250 Rules, Rule 21, Code of Vt. Rules 16-5-200:21 (WL) ("Master plan decisions include partial findings of fact and conclusions of law for a phased development or subdivision and may also include a permit for the initial construction phase."). Reviewing cumulative effects of the entire development proposed in a master plan every time we issue a permit for a particular phase of development would eliminate any efficiencies created by master plan review. See id. (establishing that the purpose of master plan proceedings is to "create[] greater efficiency in the application review process, avoid[] unnecessary and unreasonable costs, and provide[] guidance and greater predictability to the applicant and all parties by providing for master plan decisions"). When we review an individual phase of a master plan, we will therefore consider only impacts caused by that phase of development; we will reserve cumulative review for the master plan proceedings.

At the other end of the spectrum, we do not agree that, since Applicant seeks a "construction permit" we can only review impacts from construction, and not from the use of the constructed facilities. All Act 250 permits for new development are in some sense "construction permits." We nevertheless review the impacts of a development's use, not just the construction. The fact that there is also a pending master plan appeal in this case does not change this, for "[a] master plan proceeding is not a substitute for review of specific projects that are included in the plan." Re: Winhall/Stratton Fire District #1, No. 2W0519-6A-EB, Memorandum of Decision, at 5 (Vt. Envtl. Bd. Aug. 31, 1999).

We maintain that we will review impacts from both the construction and use of the development proposed in the Parking Project, but we will reserve consideration of the full impacts of the related project proposed in the master plan to the master plan appeal.

Exactly what impacts are attributable to this Parking Project is difficult to pin down, however, because the Parking Project application seeks approval for the construction of

16

individual project components that will serve secondary roles of supporting and mitigating the principal developments proposed in the village core master plan.  For example, the new parking lots will not, in and of themselves, generate traffic, but rather are proposed to provide for the parking needs of the visitors anticipated to the proposed village core developments.  Similarly, the proposed wet pond and related treatment systems will not cause more stormwater to accumulate, but rather are proposed to provide for the treatment of stormwater that will be accumulated as a result of the development and use of the village core developments.

Because of the overlap in the facilities proposed in this application and the larger project these facilities will support, we will analyze the impacts that may be caused by the construction and use of these components in the Parking Project, but will also assess the impacts of their uses in the master plan appeal.

We therefore move to the tasks at hand in this appeal: whether the proposed Parking Project development components can receive positive findings of fact and conclusions of law under the four Act 250 criteria that have been preserved for our review in this appeal.

II.    Criterion 1(E): Stream Impacts (Appellants' Question 1)

By their Question 1, Appellants ask whether the proposed Parking Project "will maintain the natural condition of streams in the project area, including, *inter alia*, the streams' respective volume, depth, velocity of water flow, physical features, aesthetic values, bank stability, water quality, and habitat, as required by 10 V.S.A. § 6086(a)(1)(E)."  Appellants' Statement of Questions at 1, filed January 13, 2014.  Criterion 1(E) requires that "the development or subdivision of lands on or adjacent to the banks of a stream [must], whenever feasible, maintain the natural condition of the stream, and will not endanger the health, safety, or welfare of the public or adjoining landowners."  10 V.S.A. § 6086(1)(E).  Applicants bear the burden of proof under Criterion 1(E).  10 V.S.A. § 6088(a).

a.  *Whether Criterion 1(E) applies to the Parking Project*

As a preliminary matter, Applicant appears to concede that Criterion 1(E) applies to this project, even though the Roaring Brook is not actually on its property and development is not literally adjacent to the stream.  The Roaring Brook first flows on the opposite side of Killington Road from the proposed development, and then crosses under Killington Road at a point about

17

100 feet away from Lots G and H. As the Roaring Brook travels further downhill, it passes the two remaining parking lots proposed in this development, Lots I and J, and then passes by the final component of this proposed development: the stormwater treatment wet pond. These developments are 75 to 100 feet away from the closest portions of the top of the bank of the Roaring Brook, with one exception: a portion of the outlet swale for the treatment pond, forty feet of which encroaches into the setback from the Roaring Brook bank.

Prior cases have not required that development actually abut streams for Criterion 1(E) to apply. See, e.g., In re Barre Granite Quarries, LLC, No. 7C1079, Findings of Fact, Conclusions of Law, and Order, at 72 (Vt. Envtl. Bd. Dec. 8, 2000) (applying Criterion 1(E) where proposed development maintained at least a 100-foot buffer from stream banks). Furthermore, ANR recommends a 50-foot riparian buffer for all development, so proposed developments will almost never occur on the actual banks of a stream. Because Applicant's proposed stormwater system will ultimately discharge treated stormwater into the Roaring Brook, and because the Project is as nearly "adjacent" to the stream as ANR recommendations allow, it is "adjacent" to the stream for the purposes of Criterion 1(E).

*b. Whether the Parking Project complies with Criterion 1(E).*

To satisfy their burden under Criterion 1(E), Applicants introduced their construction and operation stormwater discharge permits from ANR. Under 10 V.S.A. § 6086(d) and Act 250 Rule 19, permits from state environmental agencies create certain presumptions in Act 250 proceedings. An opponent to a project can rebut these presumptions by introducing evidence "fairly and reasonably indicating that the real fact is not as presumed." See In re Hawk Mountain, 149 Vt. 179, 186 (1988). Once the presumption is rebutted, it disappears, and the burden shifts back to Applicant. Id.

A permit may still be relevant as evidence of compliance, however, even after it has been rebutted. Act 250 Rules, Rule 19(F). Even after a permit has been rebutted, technical determinations by ANR receive substantial deference from this Court. See 10 V.S.A. § 6086(d) ("[T]echnical determinations of [ANR] shall be accorded substantial deference by the Commissions."); 10 V.S.A. § 8504 (providing that the Environmental Division must apply same deference to ANR technical determinations as Commissions do).

18

Rule 19(E), promulgated under 10 V.S.A. § 6086(d), enumerates six facts that may be presumed from certain specified permits. None of these six presumptions have any direct relevance to Criterion 1(E). The Environmental Board has not treated the list in Rule 19(E) as exhaustive, however, and has found compliance with Criterion 1(E) based on stormwater permits in the past. See, e.g., Re: St. Albans Grp. & Wal*Mart Stores, Inc., No. 6F0471-EB, Findings of Fact, Conclusions of Law, and Order (Altered), at 16 (Vt. Envtl. Bd. June 27, 1995).

But, even though the list of presumptions in Rule 19(E) is not exhaustive, that does not give free range to create presumptions of compliance with Act 250 Criteria that have no relation to matters considered in the permit. It would be illogical, for instance, to presume that a project complied with Criterion 1(E) because it had an air pollution permit. In a less drastic example, it would be illogical to find compliance with Criterion 1(E)'s mandate that streams be kept in their natural condition based on a stormwater permit that only addressed water pollution, but not volume of water discharged. In other words, a permit creates a presumption that determinations in the permit are true. Thus, a presumption is as broad as the permit, but not broader.

These proposed construction plans, including the outflow for the pond, have received construction and operational permits from ANR. In these permits, ANR determined that discharges that flow into the proposed stormwater treatment systems from the Project will not increase the sediment or "hydrologic load" (i.e., volume) of the receiving waters.

These determinations do not mirror the language of Criterion 1(E)—at no point in the permit does ANR declare that "the development or subdivision of lands on or adjacent to the banks of a stream will, whenever feasible, maintain the natural condition of the stream, and will not endanger the health, safety, or welfare of the public or adjoining landowners." See 10 V.S.A. § 6086(a)(1)(E). Nevertheless, ANR's two determinations satisfy Criterion 1(E) in this case because none the impacts Appellant foresees—change in "volume, depth, velocity of water flow, physical features, aesthetic values, bank stability, water quality, and habitat"—could logically come to pass if the Project will not increase the pollutant load or water volume in the stream. Therefore, unless Appellant rebuts the presumption created by Applicant's construction and operating stormwater permits, Applicant will have satisfied Criterion 1(E).

19

At trial, Appellant did not offer any of his own testimony or exhibits to rebut ANR's determinations. Appellant attempted to undermine the credibility of ANR's witnesses through cross-examination and by highlight findings ANR did not make with regard to the permit. While it is theoretically possible for a project opponent to elicit evidence in cross-examination sufficient to rebut a presumption, barring a Perry Mason or Rumpole-of-the-Bailey coup, it will be difficult for opponents to elicit evidence "fairly and reasonably indicating that the real fact is not as presumed" without calling their own witnesses or introducing their own exhibits. See In re Hawk Mountain, 149 Vt. 179, 186 (1988). Appellants' cross-examination in this case yielded no such revelations. Applicant therefore failed to rebut the presumption that the stormwater system will not increase pollution or water volume in the Roaring Brook, and Applicant has demonstrated that the Parking Project complies with Criterion 1(E).

We further note that even if the presumption did not apply, Applicant did not rely solely upon the Stormwater permit received from ANR, but also provide credible evidence from Applicant's own stormwater expert, Jeffrey Nelson, who credibly testified that the proposed Project and treatment systems within that Project will preserve the natural condition of the Roaring Brook during significant storm events, and that even during such significant storms, the proposed development will not cause stormwater or other effects that will "endanger the health, safety, or welfare of the public or adjoining landowners." 10 V.S.A. § 6086(a)(1)(E).

Based upon all this credible evidence, we conclude that the Parking Project as proposed conforms to Criterion 1(E). Nothing in our legal conclusions here is intended to foreclose Appellants' ability to assert that the cumulative impacts from all development proposed in the master plan application may not support factual findings or legal conclusions that the master plan development conforms with Act 250 criterion 1(E).

III.    Criterion 5: Traffic (Appellants' Question 2)

By their Question 2 from the Statement of Questions Appellants ask:

2.      Whether under 10 V.S.A. § 8086(a)(5) the Parking Project will create unreasonable congestion or unsafe conditions with respect to the use of highways and other means of transportation, including congestion or unsafe conditions, *inter alia*, due to (a) the volume of traffic that will be created by the project, and/or (b) the operation of a shuttle bus service and the interaction of that service with pedestrians.

Appellants' Statement of Questions at 1, filed January 13, 2014.

Act 250 Criterion 5 requires that a project will not result in "unreasonable congestion or unsafe conditions with respect to use of the highways."  10 V.S.A. § 6086(a)(5).   Based upon the credible evidence that was admitted at trial, we conclude that the construction of the Parking Project improvements will not cause the traffic congestion impacts Appellants fear. The Project will not cause an increase in traffic, a fact that even Appellants admit.[4] Rather, the proposed parking lots will serve the traffic that may be caused by the other developments proposed in the village core, as detailed in the master plan application.  It is for that reason that the parties and the Court agreed that traffic impacts from increased traffic volumes associated with the other developments in the master plan, including cumulative traffic impacts, are more appropriately analyzed in the master plan appeal.

Nonetheless, there are certain aspects of the proposed construction, including the construction of the proposed Road H, that we must analyze in this permit application appeal, because these aspects may affect the flow and safety of traffic in the area.

*a. Congestion*

Road H will provide an alternate pass-through between Killington Road and Old Mill Road, allowing visitors to avoid the traffic that accumulates at the current main base area, particularly during busy winter weekends.  Also, with the current parking situation, the only entrance to the parking lots is near the main base area.  Adding an entrance north of the base area and a shuttle service to the lifts may encourage drivers to park and ride, alleviating pick-up and drop-off traffic at the main base area and lightening traffic along Killington Road.  Based upon the credible evidence that was admitted at trial, we conclude that the construction of the Parking Project improvements will not cause the traffic congestion that Mr. Durkee fears for his two Killington Road properties, but will actually improve congestion.

---

[4]   Appellants conceded this point in their post-trial briefing.  New development in the Village Core proposed in Applicant's related master plan application may increase traffic in the area.  While parking lots proposed in this appeal may serve that additional traffic, they will not cause it.  The Court will therefore consider traffic impacts from the development associated with the master plan in the master plan appeal, and not in this matter.

*b. Safety*

The intersections along Road H will provide safe access between the Road and the adjoining parking areas, including the existing parking lot for The Mountain Inn. The intersection with Old Mill Road will also have sufficient signage and sight distances to allow cars to safely pass through the intersection. A sidewalk is now proposed to run parallel to Road H, just north of the Road and adjacent to the existing Pinnacle development. A recently added cross-walk will allow pedestrians to safely cross over Road H near its intersection with Old Mill Road, so that the pedestrians may continue to travel to and from the Pinnacle development, the main base area, and other adjoining developments. A recently-added traffic sign along Old Mill Road will warn those travelling below Road H that there is "No Outlet," since Old Mill Road dead ends at the existing sewer treatment plant. All these features lead us to conclude that the internal intersections along Road H and its intersection with Old Mill Road in conformance with Criterion 5.

The proposed intersection between Road H and Killington Road requires more scrutiny, simply due to the level of traffic that flows along Killington Road in this area, to and from the existing main base area. The construction of these parking lots will alleviate some of that traffic, since day skiers and other visitors will no longer be required to travel to the main base area to park. The intersection itself is well designed, allowing for three travel lanes. Road H will have dedicated right and left turn lanes onto Killington Road. Killington Road will have a dedicated left-turn lane for southbound traffic to turn onto Road H and a right-hand pass-through lane. Killington Road will also have two northbound lanes near Road H, allowing northbound traffic to safely pass cars attempting to turn onto Road H. Sight distances are adequate for Road H cars turning onto Killington Road to safely pull into the intersection.

Finally, the shuttle bus loop will run along Killington Road, Road H, Old Mill Road, and internal roadways near the main base area. This route poses little danger to pedestrians. Few if any pedestrians use Killington Road, and Road H has a sidewalk separating Road H from traffic. In the parking lots and at the main base area there will be a system of walkways (and personnel on busy days) directing pedestrian and vehicular traffic. We therefore conclude that the proposed shuttle bus and parking lot improvements will not pose a danger to pedestrians.

For all these reasons, we conclude that the proposal to construct the Parking Project improvements as represented conform to Act 250 Criterion 5 and therefore answer Appellants' Question 2 in that fashion. Nothing in these determinations shall foreclose Appellants from asserting that the cumulative impacts from all development proposed in the master plan application may not support factual findings or legal conclusions that the master plan development conforms with Act 250 criterion 5.

## IV.    Criterion 8: Aesthetics (Appellants' Questions 4, 5, and 6)

Questions 4, 5, and 6 of Appellants' Statement of Questions relate to Criterion 8:

4.  Whether the Parking Project will have an undue adverse effect on the scenic or natural beauty of the area, or aesthetics, under 10 V.S.A. § 6086(a)(8).

5.  Whether the scale and location of the Parking Project and associated developments are shocking and offensive to the average person such that the Parking Project will have an undue adverse effect on the scenic or natural beauty of the area, or aesthetics, under 10 V.S.A. § 6086(a)(8).

6.  Whether the applicant has failed to take generally available mitigating steps to minimize the impact of the Parking Project such that the Parking Project will have an undue adverse effect on the scenic or natural beauty of the area, or aesthetics, under 10 V.S.A. § 6086(a)(8).

Appellants' Statement of Questions at 2, filed January 13, 2014.

Criterion 8 requires that a project "[w]ill not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas." 10 V.S.A. § 6086(a)(8). Appellants' Question 4 replicates this statutory language, and their Questions 5 and 6 mirror two of the stages of the Act 250 aesthetic analysis first announced by the former Vermont Environmental Board in its review in the mid-1980s of the Quechee Lakes development. Ultimately, the Vermont Supreme Court adopted the two-part test announced by the Environmental Board; more recently, it summarized the Quechee test under criterion 8 as follows:

> The [District Commission] employs a two-pronged approach to determine if an application complies with Criterion 8. First, it determines if the proposed project will have an adverse aesthetic impact, and if so, it considers whether the adverse impact would be undue. An adverse impact is considered undue if any one of the three following questions is answered in the affirmative: (1) does the project violate a clear, written community standard intended to

23

preserve the aesthetics or scenic, natural beauty of the area; (2) does the project offend the sensibilities of the average person; and (3) has the applicant failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings.

In re: Appeal of Times & Seasons, LLC and Benoit, 2008 VT 7, ¶ 8 (citations omitted). Opponents of a proposed development bear the burden of persuasion under Criterion 8, but the initial burden of production remains with an applicant. 10 V.S.A. § 6088(b); see also In re Eastview at Middlebury, Inc., No. 256-11-06 Vtec, slip op. at 5 (Vt. Envtl. Ct. Feb. 15, 2008) (Durkin, J.), aff'd, 2009 VT 98, 187 Vt. 208.

Our focus is the impacts upon two of the Durkee Entities—MPI, which owns a property on East Mountain Road, and MDI, which owns property on Mountainside Drive—which are the only Appellants that secured party status under Criterion 8. These entities allege that MDI's property on Mountainside Drive has a view of the Parking Project area; it is unclear from the trial testimony whether MPI, through its agent, Mr. Durkee, asserted that the Project was also visible from MPI property.[5] However, even if a view of the project is possible from either of these properties, it is only partial, at best, and is tempered by the considerable distance between the properties and the Project. Appellants also allege that the Parking Project will result in a loss of forest cover due to the construction of parking lots, and possible "noise pollution" from the use of the new parking areas. Appellants chose not to provide a factual foundation for these allegations when offered an opportunity to do so at trial.

Our analysis of the proposed development must be taken within its planned context, see Re: Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, at 18 (Vt. Envtl. Bd. Nov. 4, 1985), which consists of an already highly developed area of a large ski resort. The Parking Project is meant to replace equally large and somewhat undefined gravel parking areas that have little screening or landscaping. The existing parking lots are located at the main base area and can hardly be regarded as aesthetically attractive or contributing a positive aesthetic character to that area.

---

[5] Mr. Durkee did not offer testimony at trial. These assertions were only made during cross-examination of Applicant's witnesses.

The Proposed Parking lots, Road H and sidewalk, and the stormwater detention pond will all be heavily screened by existing vegetation. Additional landscaping and tree plantings will provide further screening and an aesthetic softening of the Parking Project development. Off-site views will be minimal, both from Appellants' two identified locations and during a driver's travels down Killington Road. All lighting proposed for these new parking lots will be provided by downward-facing lighting that will shield the light source from off-site locations. We received no direct evidence at trial of any aesthetic adversities that the proposed project will cause. We therefore conclude that the Parking Project as proposed will not cause any adverse impacts, particularly in relation to the property interests owned by MPI and MDI.

Furthermore, even if the Project entailed adverse aesthetic impacts, these impacts would not be undue. Appellants produced no evidence of "a clear, written community standard" that this Project violates. In fact, the only evidence we received was that the applicable provisions of the Town Plan, the Regional Plan, and the municipal zoning regulations encourage this type of development in this designated area. Similarly, we received no evidence to support a conclusion that the Project as proposed "offend[s] the sensibilities of the average person." Finally, Applicant modified its plans to mitigate potential impacts by swapping the locations of Road H and its sidewalk, adding landscaping and screening, and adding highway signage.

For all these reasons, we conclude that the Parking Project as proposed conforms to Act 250 Criterion 8. We therefore answer Appellants' Questions 4, 5, and 6 in a similar fashion.

V.      Criterion 10: Regional Plan conformance (Appellants' Question 9)

By their Question 9, Appellants ask "[w]hether the Parking project is in conformance with the Rutland Regional Plan, as required by 10 V.S.A. § 6086(a)(10)." Appellants' Statement of Questions at 2, filed January 13, 2014. That Question tracks the statute, which asks whether a proposed project is "in conformance with any duly adopted local or regional plan or capital program under 24 V.S.A. chapter 117." 10 V.S.A. § 6086(a)(10). The Applicant bears the burden under Criterion 10. 10 V.S.A. § 6088(a). Since Appellants' Question focuses its only inquiry upon the applicable regional plan, we direct our only focus to that plan. The Rutland Regional Plan ("Regional Plan") was admitted at trial as Exhibit T.

Applicant directed the Court to provisions of the Rutland Regional Plan that appear to encourage these types of projects. In particular, the area proposed for this development, as well as the general area of the proposed master plan development in Docket No. 147-10-13 Vtec, is one of only five specific areas in all of Rutland County that is identified as a "Sub-Regional Center" for future development. Id. The area is also identified in the Plan as a "High Density" Area. Neither party directed the Court to any regulatory portion of the Regional Plan with which this proposed Project creates a conflict. We therefore conclude that this Parking Project conforms to the Regional Plan, and we answer Appellants' Question 9 in the affirmative.

### Conclusion

For all the reasons stated above, we conclude that the Killington Resort Parking Project as proposed conforms to the Act 250 criteria presented for our review in this appeal, specifically Criteria 1(E), 5, 8, and 10 (Regional Plan). We therefore **AFFIRM** Applicant's Act 250 permit for the Parking Project. Nothing contained in this Merits Decision or the accompanying Judgment Order shall be interpreted as prohibiting this Court from making cumulative impact determinations under Act 250 Criteria 1(E) and 5 in the related but separate master plan application appeal, Docket No. 147-10-13 Vtec.

Our determinations here relate only to the pending Parking Project application and not to the determinations to be issued in the related but separate appeal: Killington Act 250 Master Plan Application, Docket No. 147-10-13 Vtec. The proceedings in this appeal (Docket No. 173-12-13 Vtec) are hereby remanded to the District Commission solely to complete the ministerial act of issuing an Act 250 permit governing the Parking Project that conforms to this Judgment Order, the accompanying Merits Decision, and the provisions of the District Commission's Altered Findings of Fact and Conclusions of Law (#1R0981 (Altered)) relating to the Parking Project application that were not the subject of the appeal before this Court in this appeal.

Nothing contained in this Merits Decision or the accompanying Judgment Order shall be interpreted as prohibiting this Court from making cumulative impact determinations under Act 250 Criteria 1(E) and 5 in the related but separate master plan application appeal, Docket No. 147-10-13 Vtec.

26

This completes the current proceedings in this Docket before this Court. A Judgment Order accompanies this Merits Decision.

Electronically signed at Newfane, Vermont on March 7, 2016 pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Judge
Environmental Division